## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

MICHELLE SCHMID, LUIS
MUNOZ, SHERRI MCCALL,
PAMELA ANDERSON, DANIEL
MCGORREY, and JOSHUA
CAPLES on behalf of themselves and
all others similarly situated,

     *Plaintiffs*,

        v.

FCA US LLC,

     *Defendant*.

Hon.
Case No.  20-cv-11090

## CLASS ACTION COMPLAINT

## JURY TRIAL DEMANDED

Douglas L. Toering (P34329)
dtoering@manteselaw.com
Kenneth R. Chadwell (P39121)
kchadwell@manteselaw.com
**MANTESE HONIGMAN, PC**
1361 E. Big Beaver Rd.
Troy, MI 48083

**CAPSTONE LAW APC**
Steven R. Weinmann
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi
1875 Century Park East, Suite 1000
Los Angeles, CA 90067

Timothy N. Mathews
Alex M. Kashurba
**CHIMICLES SCHWARTZ KRINER
& DONALDSON SMITH LLP**
361 W. Lancaster Avenue
Haverford, Pennsylvania 19041

**BERGER MONTAGUE PC**
Russell D. Paul
Jeffrey L. Osterwise
Amey J. Park
Abigail J. Gertner
1818 Market Street
Suite 3600
Philadelphia, PA 19103

*Counsel for Plaintiffs and the Proposed Putative Class Members*

# TABLE OF CONTENTS

JURISDICTION AND VENUE ---------------------------------------------------------- 4

PARTIES ------------------------------------------------------------------------------------ 5

    Plaintiff Michelle Schmid (California) ---------------------------------------- 5

    Plaintiff Luis Munoz (New Jersey) ----------------------------------------------- 7

    Plaintiff Sherri McCall (New York) ---------------------------------------------- 9

    Plaintiff Pamela Anderson (Maryland) ---------------------------------------- 10

    Plaintiff Daniel McGorrey (Pennsylvania) ----------------------------------- 13

    Plaintiff Joshua Caples (North Carolina) ------------------------------------- 15

    Defendant ------------------------------------------------------------------------------ 16

FACTUAL ALLEGATIONS ----------------------------------------------------------- 17

    A.    The Oil Consumption Defect ------------------------------------------- 17

    B.    FCA's Knowledge of the Defect --------------------------------------- 20

TOLLING OF STATUTES OF LIMITATIONS ------------------------------------- 43

CLASS ACTION ALLEGATIONS ------------------------------------------------- 44

CLAIMS FOR RELIEF --------------------------------------------------------------- 48

COUNT I
Violations of the California Consumers Legal Remedies Act ("CLRA")
Cal. Civ. Code §§ 1750–1785 Plaintiffs Schmid Individually and on
Behalf of the California Subclass Who Purchased or Leased a Class Vehicle
For Personal Use ------------------------------------------------------------------------- 48

COUNT II
Violations of the California Unfair Competitions Law ("UCL")
Cal. Bus. & Prof. Code §§ 17200–17210
Plaintiff Schmid, Individually and on Behalf of the California Subclass------------53

COUNT III
Violations of the New Jersey Consumer Fraud Act ("NJCFA")
N.J. Stat. Ann. §§ 56:8-1–56:8-20
Plaintiff Munoz, Individually and On Behalf of the New Jersey Subclass----------56

COUNT IV
Violations of the New York General Business Law
N.Y. Gen. Bus. Law § 349 ("NYGBL § 349")
Plaintiff McCall, Individually and on Behalf of the New York Subclass -----------59

COUNT V
Violations of the New York General Business Law
N.Y. Gen. Bus. Law § 350 ("NYGBL § 350")
Plaintiff McCall, Individually and on Behalf of the New York Subclass -----------61

COUNT VI
Violations of the Maryland Consumer Protection Act ("Maryland CPA")
Md. Code Com. Law § 13-101, et seq.
Plaintiff Anderson, Individually and on Behalf of the Maryland Subclass----------63

COUNT VII
Violation of the Pennsylvania Unfair Trade Practices and Consumer
Protection Law ("UTPCPL") 73 Pa. Cons. Stat. §§ 201-1 – 201-9.3
Plaintiff McGorrey, Individually and On Behalf and the
Pennsylvania Subclass --------------------------------------------------------------------69

COUNT VIII
Violations of the North Carolina Unfair and Deceptive Acts and Practices Act
("North Carolina UDTPA")
N.C. Gen. Stat. § 75-1.1, *et seq.* ---------------------------------------------------------71

COUNT IX
Breach of Express Warranty
Plaintiffs, Individually and on Behalf of the State Subclasses ------------------------76

COUNT X
Breach of the Implied Warranty of Merchantability
Plaintiffs, Individually and on Behalf of the State Subclasses -------------------------79

COUNT XI
Violations of the Magnuson–Moss Warranty Act ("MMWA")
15 U.S.C. §§ 2301–2312
All Plaintiffs, Individually and on Behalf of the Nationwide Class -------------------81

COUNT XII
Violations of Song–Beverly Consumer Warranty Act
For Breach of Express Warranty Cal. Civ. Code §§ 1790–1795.8
Plaintiff Schmid, Individually and on Behalf of the California Subclass
Who Purchased or Leased Class Vehicles for Personal, Family, or Household
Purposes      84

COUNT XIII
Violations of Song–Beverly Consumer Warranty Act
For Breach of Implied Warranty Cal. Civ. Code §§ 1790–1795.8
Plaintiff Schmid, Individually and on Behalf of the California Subclass Who
Purchased or Leased for Personal, Family or Household Purposes -------------------86

COUNT XIV
Fraudulent Concealment
All Plaintiffs, Individually and on Behalf of the State Subclasses --------------------89

COUNT XV
Unjust Enrichment
In the Alternative to All Other Claims
All Plaintiffs, Individually and On Behalf the State Subclasses -----------------------90

PRAYER FOR RELIEF -----------------------------------------------------------------------92

JURY DEMAND -------------------------------------------------------------------------------92

Plaintiffs Michelle Schmid, Luis Munoz, Sherri McCall, Pamela Anderson, Daniel McGorrey, and Joshua Caples ("Plaintiffs") individually and on behalf of all others similarly situated (the "Class" as defined below), by and through their attorneys, allege as follows against Defendant FCA US LLC ("FCA").

## INTRODUCTION

1.    This is a class action brought against FCA by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of 2014-2020 Jeep Cherokees, 2015-2020 Jeep Renegades, 2017-2020 Jeep Compasses, 2013-2016 Dodge Darts, 2015-2020 Ram ProMaster City's, 2015-2016 Chrysler 200's, and 2016-2020 Fiat 500X's (the "Class Vehicles").  Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles.

2.    The Class Vehicles are all equipped with a 2.4L Tigershark multiair four-cylinder engine.  These engines suffer from a defect that causes them to burn or consume excessive amounts of engine oil (the "Oil Consumption Defect" or "Defect").

3.    As a result of the Defect, the Class Vehicles stall unexpectedly and without warning, often when turning at an intersection or when accelerating or decelerating, creating a serious safety hazard.

4.    The Defect can also result in engine damage and premature wear that necessitates costly repairs, including engine replacements.

4

5.     Owners and lessees are also forced to incur considerable expense and burden in continually having to add oil to their vehicles.

6.     Because the Oil Consumption Defect makes Class Vehicles unreliable and can render them inoperable, it affects their central functionality.

7.     FCA is aware of the Oil Consumption Defect but has refused to provide adequate repairs to eliminate it under warranty, and has continually sold the Class Vehicles without disclosing this known defect to purchasers.

8.     FCA has been aware of the defect since at least 2013, as evidenced by, *inter alia*, large numbers of consumers who have complained about this Defect dating back to at least 2013, including when consumers brought their Class Vehicles to FCA's authorized dealers for repairs.

9.     FCA's policy, as communicated to consumers who complain, is that it is acceptable for brand new Class Vehicles to burn 1 quart of oil every 1,000 miles. Upon information and belief, the Tigershark engine holds 5.5 quarts of oil, and under ordinary driving conditions the oil does not need to be changed for more than 5,500 miles.  This means that under FCA's oil burning policy it is acceptable to burn *all* the oil in the engine before it is necessary to perform an oil change.

10.     In most instances, FCA has refused to perform any repair, instead telling consumers that it is acceptable to burn 1 quart for every 1,000 miles and advising them to add additional oil between oil changes.  In rare circumstances FCA

will provide a full engine replacement but upon information and belief the replacement engines suffer the same defect.

11.     Despite FCA's knowledge of the Defect, which renders the Class Vehicles hazardous and unsuitable for their intended purpose, it has failed to provide adequate repairs and has also failed to disclose the Defect to unsuspecting consumers.

12.     Due to the undisclosed Oil Consumption Defect, Plaintiffs and Class Members were deprived of the benefit of their bargain in purchasing or leasing their FCA vehicles.  These customers continue to have to live with the risks of their vehicles stalling in the middle of traffic, potential engine damage, higher than expected maintenance costs, and diminution of value of their vehicles.  Plaintiffs accordingly seek relief both for themselves and for other owners or lessees of these Class Vehicles.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This

Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.    Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1391 because FCA is headquartered in the Eastern District of Michigan and regularly transacts business in this district, is subject to personal jurisdiction in this district and, therefore, is deemed to be a citizen of this district. Additionally, FCA advertises in this district and has received substantial revenue and profits from its sales and/or leasing of Class Vehicles in this district; therefore, a substantial part of the events and/or omissions giving rise to the claims herein occurred, in part, within this district.

15.    This Court has personal jurisdiction over FCA because it maintains its principal place of business in the Eastern District of Michigan, has conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within Michigan and throughout the United States.

## PARTIES

### Plaintiff Michelle Schmid (California)

16.    Plaintiff Michelle Schmid is a citizen and resident of California.

17.    On or around January 26, 2018, Ms. Schmid purchased a new 2017 Jeep Renegade from Moss Bros. Chrysler Dodge Jeep RAM Fiat, which is an authorized

FCA dealership in San Bernardino, CA. Prior to her purchase, Ms. Schmid spoke with her dealer about the vehicle, test drove the vehicle, reviewed the window sticker, and looked at a Jeep brochure. Safety and reliability were important factors in her decision, and she would not have purchased the vehicle if the Oil Consumption Defect had been disclosed.

18. Ms. Schmid purchased her vehicle for personal, family, or household use. Ms. Schmid at all times attempted to use her Class Vehicle in the normal and expected manner.

19. In or around May 2018, Ms. Schmid's vehicle stalled while traveling approximately 55 mph on a highway, presenting a serious risk of crashing. She took it to Victorville Motors, an authorized FCA dealership, who discovered that the oil pan was completely empty.

20. Then, a few months later, the vehicle stalled again while Ms. Schmid was driving, once again presenting a serious safety risk. The dealership had her return after 1,000 miles in order to perform an oil consumption test. When she returned, the dealer said that some oil consumption was normal. Nevertheless, they told Ms. Schmid that she would need to change her oil every 4,000 miles and check her dipstick whenever refilling her gas tank.

21. Ms. Schmid has continued to complain about the oil consumption issue during her subsequent oil changes but has received no additional repair or assistance.

22.     Ms. Schmid fears her vehicle will stall again and continues to endure the expense and inconvenience of more frequent than expected oil changes.

23.     Had FCA disclosed the Defect, Ms. Schmid would not have purchased her Class Vehicle or would have paid significantly less for it.

24.     Additionally, as a result of the Defect, Ms. Schmid has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. Her vehicle has also suffered diminution in value due to the Defect and the resulting loss in her Jeep vehicle's resale value.

**Plaintiff Luis Munoz (New Jersey)**

25.     Plaintiff Luis Munoz is a citizen and resident of New Jersey.

26.     On or around June 15, 2017, Mr. Munoz purchased a new 2017 Jeep Compass from City Auto Park, an authorized FCA dealership in Burlington, NJ. Prior to his purchase, Mr. Munoz spoke with his dealer about the vehicle and looked at the window sticker. Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the Oil Consumption Defect had been disclosed.

27.     Mr. Munoz purchased his vehicle for personal, family, or household use. Mr. Munoz at all times has attempted to use his Class Vehicle in the normal and expected manner.

9

28.    On or around July 2018, Mr. Munoz observed that his vehicle had burned nearly 1 quart of oil after driving approximately 1,000 miles. Shortly thereafter, he presented his vehicle to the dealership and he was told by dealership personnel that it is normal for these vehicle models to burn 1 quart of oil every 1,000 miles of driving.  No dashboard notification had alerted him that his oil was low.

29.    The dealership had him return after another 1,000 miles in order to perform an oil consumption test.  When he returned, the dealer told him that the consumption was normal.

30.    Mr. Munoz has continued to complain about the oil consumption issue during his subsequent oil changes but has received no additional repairs or assistance.

31.    Mr. Munoz fears his vehicle will stall without warning and continue to endure the expense and inconvenience of more frequent than expected oil changes.

32.    Had FCA disclosed the Oil Consumption Defect, Mr. Munoz would not have purchased his Class Vehicle or would have paid significantly less for it.

33.    Additionally, as a result of the Defect, Mr. Munoz incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. His vehicle has also suffered diminution in value due to the Defect and the resulting loss in his Jeep vehicle's resale value.

## Plaintiff Sherri McCall (New York)

34.    Plaintiff Sherri McCall is a citizen and resident of New York.

35.    On or around October 31, 2019, Ms. McCall purchased a used 2019 Jeep Cherokee from RS Motors, which is an authorized FCA dealership in Falconer, NY. Prior to purchase, Ms. McCall test drove the vehicle, reviewed the window sticker, and spoke with her dealer about the vehicle.  Safety and reliability were important factors in her decision, and she would not have purchased the vehicle if the Oil Consumption Defect had been disclosed.

36.    Ms. McCall purchased her vehicle for personal, family, or household use.  Ms. McCall has at all times attempted to use her Class Vehicle in the normal and expected manner.

37.    After owning the vehicle for approximately a month, Ms. McCall and her husband noticed that the oil was low.  She took it into the dealership which had her return after 1,000 miles in order to perform an oil consumption test.  When she returned, the dealer said that some oil consumption was normal.

38.    On a subsequent visit to the dealership for the problem, the dealer changed her PCV valve.  This repair did not improve the oil consumption problem.

39.    Her vehicle continues to consistently burn about 1.5 quarts of oil per 2,000 miles

11

40.    Ms. McCall has continued to complain about the oil consumption issue during her subsequent dealership visits but has received no additional repair or assistance.

41.    Ms. McCall fears her vehicle will stall and continues to endure the expense and inconvenience of adding and changing the oil more frequently than expected.

42.    Had FCA disclosed the Defect, Ms. McCall would not have purchased her Class Vehicle or would have paid significantly less for it.

43.    Additionally, as a result of the Defect, Ms. McCall has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. Her vehicle has also suffered diminution in value due to the Defect and the resulting loss in her Jeep vehicle's resale value.

### Plaintiff Pamela Anderson (Maryland)

44.    Plaintiff Pamela Anderson is a citizen and resident of Maryland.

45.    On or around May 18, 2018, Ms. Anderson purchased a new 2019 Jeep Cherokee from Fitzgerald Auto Mall, which is an authorized FCA dealership in Lexington Park, Maryland.  Prior to her purchase, Ms. Anderson spoke with her dealer about the vehicle, test drove the vehicle, and reviewed the window sticker. Safety and reliability were important factors in her decision, and she would not have purchased the vehicle if the Oil Consumption Defect had been disclosed.

12

46.  Ms. Anderson purchased her vehicle for personal, family, or household use. At all times, Ms. Anderson has attempted to use her Class Vehicle in the normal and expected manner.

47.  In or around late summer 2018, when her Class Vehicle had just over 3,000 miles on the odometer, the dash lights flashed and the vehicle stalled while Ms. Anderson was turning right at an intersection, presenting a serious risk of a collision.

48.  To the best of her recollection, Ms. Anderson's Class Vehicle has stalled five times.  She reported this incident to Fitzgerald Auto Mall as well as FCA's hotline.

49.  After performing an oil consumption test on her Class Vehicle, during which it was found that her vehicle was consuming between 3 to 4 quarts of oil in 3,000 miles of driving, Fitzgerald Auto Mall replaced the engine block on April 11, 2019.  At the time, her Class Vehicle had approximately 11,644 on the odometer.

50.  Although they replaced the engine block in her Class Vehicle, Ms. Anderson did not receive any assurance from FCA that she would not again experience excessive oil consumption.

51.  On September 4, 2019, when her Class Vehicle had approximately 14,172 on the odometer, Ms. Anderson took her vehicle to the dealership for an oil change.  Before the oil change was begun, the technician noted that the oil level in

13

her vehicle was below the minimum mark on the dipstick. The dealership asked Ms. Anderson to bring in her vehicle every 1,000 miles so they could continue to monitor the oil level.

52.    On September 20, 2019, Ms. Anderson returned her Class Vehicle to the dealership, which performed another oil consumption test and changed the oil in her vehicle. The dealership asked that Ms. Anderson continue to bring in her vehicle every 1,000 miles so they could continue to monitor the oil level.

53.    On November 18, 2019, Ms. Anderson returned her Class Vehicle to the dealership, which performed another oil consumption test and changed the oil in her vehicle. The technician noted that the engine oil level in her vehicle was half a quart low and "within spec currently."

54.    Ms. Anderson has followed the dealership's instructions, returning so frequently to have the oil level in her Class Vehicle monitored, at their request, that she feels she has spent more time at the dealership than driving the vehicle.

55.    Ms. Anderson fears her vehicle will stall again and continues to endure the expense and inconvenience of more frequent than expected oil changes and monitoring. Despite the fact that by their own testing the engine in the Class Vehicle continues to consume oil excessively, Ms. Anderson has not received any assurances about the permanency of the repair or an extended warranty.

14

56.     Had FCA disclosed the Defect, Ms. Anderson would not have purchased her Class Vehicle or would have paid significantly less for it.

57.     Additionally, as a result of the Defect, Ms. Anderson has incurred out-of-pocket service costs, and lost time. Her vehicle has also suffered diminution in value due to the Defect and the resulting loss in her Jeep vehicle's resale value.

### Plaintiff Daniel McGorrey (Pennsylvania)

58.     Plaintiff Daniel McGorrey is a citizen and resident of Pennsylvania.

59.     On or around November 21, 2018, Mr. McGorrey purchased a new 2018 Jeep Renegade from Chapman Chrysler Jeep Dodge Ram, which is an authorized FCA dealership in Horsham, Pennsylvania. Prior to his purchase, Mr. McGorrey viewed information about the vehicle on Jeep's website, spoke with his dealer about the vehicle, test drove the vehicle, and reviewed the window sticker.  Safety and reliability were important factors in his decision, and he would not have purchased the vehicle if the oil consumption defect had been disclosed.

60.     Mr. McGorrey purchased his vehicle for personal, family, or household use. Mr. McGorrey at all times has attempted to use his Class Vehicle in the normal and expected manner.

61.     On or around January 25, 2019, Mr. McGorrey's vehicle stalled out while making a left turn on a four-lane road.  Shortly thereafter, he presented his vehicle to the dealership and they discovered his oil pan was completely empty.  His

vehicle had 3,020 miles at this time and no dashboard notification had alerted him that his oil was low.

62.    The dealership had him return after 1,000 miles in order to perform an oil consumption test.  When he returned, the dealership personnel said that some oil consumption was normal.  Nevertheless, they told Mr. McGorrey that he would need to change his oil every 4,000 miles and check his dipstick whenever refilling his gas tank.  Absent the Oil Consumption Defect, Mr. McGorrey would need to change his oil far less frequently.

63.    Mr. McGorrey has continued to complain about the oil consumption issue during his subsequent oil changes but has received no additional repair or assistance.  He also reached out to FCA's customer service which told him that the issue was between him and the dealership.

64.    Mr. McGorrey fears his vehicle will stall again and continues to endure the expense and inconvenience more frequent than expected oil changes.

65.    Had FCA disclosed the Defect, Mr. McGorrey would not have purchased his Class Vehicle or would have paid significantly less for it.

66.    Additionally, as a result of the Defect, Mr. McGorrey has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. His vehicle has also suffered diminution in value due to the Defect and the resulting loss in his Jeep vehicle's resale value.

16

## Plaintiff Joshua Caples (North Carolina)

67.    Plaintiff Joshua Caples is a citizen and resident of North Carolina.

68.    On or around September 2018, Mr. Caples purchased a new 2019 Jeep Cherokee from Nichols Dodge Chrysler Jeep, now known as Cox Chrysler Dodge Jeep Ram, which is an authorized FCA dealership in Burlington, North Carolina. Prior to his purchase, Mr. Caples spoke with his dealer about the vehicle, test drove the vehicle, and reviewed the window sticker. Safety and reliability were important factors in his decision, and he would not have leased the vehicle if the Oil Consumption Defect had been disclosed.

69.    Mr. Caples purchased his vehicle for personal, family, or household use. Mr. Caples has attempted to use at all times his Class Vehicle in the normal and expected manner.

70.    On or around February 17, 2020, Mr. Caples's Class Vehicle stalled out while he was driving and was nearly hit by another vehicle. There was no dashboard notification of any issue, or to alert him that his oil was low. After managing to restart his vehicle, Mr. Caples called Cox Chrysler Dodge Jeep Ram to report the stall and ask for a repair under warranty. A service technician asked him if his vehicle had the 2.4L engine. When Mr. Caples confirmed that his vehicle did have this engine, the technician informed him that he should check the oil because the Tigershark engines if even the least bit low on oil have a tendency to shut off. The

17

technician did not advise Mr. Caples to bring his car in for an oil consumption test, or other inspection or repair.

71. Mr. Caples fears his vehicle will stall again and continues to endure the expense and inconvenience of more frequent than expected oil changes.

72. Had FCA disclosed the Defect, Mr. Caples would not have purchased his Class Vehicle or would have paid significantly less for it.

73. Additionally, as a result of the Defect, Mr. Caples has incurred out-of-pocket expenses to temporarily remedy the Defect, service costs, and lost time. His vehicle has also suffered diminution in value due to the Defect and the resulting loss in his Jeep vehicle's resale value.

## Defendant

74. FCA US LLC ("FCA") is a Delaware Limited Liability Company headquartered in Auburn Hills, Michigan.

75. FCA is engaged in the business of designing, manufacturing, warranting, marketing, advertising and selling vehicles, including the Class Vehicles, under the "Chrysler", "Jeep", "Dodge", "RAM", and "Fiat" brand names through a network of more than 2,000 dealerships in the United States.

76. The design, manufacture, distribution, service, repair, modification, installation and decisions regarding the engines and other components within the Class Vehicles were controlled exclusively by FCA and its agents and affiliates.

18

## FACTUAL ALLEGATIONS

**A.    The Oil Consumption Defect**

77.    The purpose of engine oil is to provide lubrication in order to reduce friction and wear on moving parts of a vehicle's engine. Although it is necessary to change the oil in a vehicle periodically as the oil gets dirty and thick over time, a properly functioning engine should not typically burn or consume significant amounts of engine oil.

78.    If there is insufficient oil, the engine will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure. Insufficient oil can also result in engine stalling while the vehicle is in use.

79.    Moreover, when an engine burns oil, the engine will run rough (because oil does not fully combust in the cylinders), and spark plugs will become fouled, which can cause further problems in other engine components.

80.    The Class Vehicles Class are all equipped with a 2.4L Tigershark multiair four-cylinder engine. These engines suffer from a Defect that results in excessive consumption of engine oil under ordinary use. A very large number of drivers report that their Class Vehicles consume or burn off as much as one quart or more of oil per 750-1,000 miles.

19

81.    According to the owners' manual for the 2018 Jeep Compass, the vehicle's computerized diagnostic system identifies when it is time for an oil change based on measurements of oil "health" (as opposed to set intervals), which usually occurs between 3,500-10,000 miles depending on driving conditions.[1] The manual states that the oil should be changed every 4,000 miles if it is driven under conditions FCA characterizes as "Severe Duty." Thus, under normal conditions, vehicles should be able to go over 5,000 miles between oil changes.

82.    Class Vehicles hold 5.5 quarts of oil. If an engine consumes one quart or more of oil per 750-1,000 miles, that means Class Vehicles can completely run out of oil before an oil change is recommended.

83.    As a result of this Defect, Drivers find that they are low on or even out of oil or that they regularly must add oil in between oil changes.

84.    The owners' manuals for Class Vehicles state that "[y]our vehicle is equipped with an automatic oil change indicator system. The oil change indicator system will remind you that it is time to take your vehicle in for scheduled maintenance."[2]  Despite these representations, drivers often report their engines stalling and their Class Vehicles low or out of oil without receiving a notification from the automatic oil change indicator.

---

[1] https://ownermanual.co/manual/2018-jeep-compass-owners-manual/pdf/ at p. 357.
[2] *Id*.

85.    Upon information and belief, the Defect is caused by one or more problems which result in oil escaping past the piston rings and cylinder wall and entering the combustion chamber.  Once engine oil is in the combustion chamber, it will not only cause a decrease in engine performance but the engine oil will also be burned off during the Combustion Cycle sequence thereby reducing the overall amount of oil contained in the engine.

86.    This Defect poses a significant safety hazard for drivers as it can cause the vehicles to stall while in operation.  This occurs because the engine will shut itself off when it detects a low oil condition to prevent the engine from destroying itself.  Stalling most often occurs when the Class Vehicles are turning, accelerating, or decelerating, because during these maneuvers the oil sloshes to one side of the oil sump.  Stalling during these maneuvers can be particularly dangerous because it means the Class Vehicles can stall while turning at an intersection, or entering or exiting a highway, as examples.

87.    The Defect can also cause severe engine damage when a vehicle unexpectedly runs low on oil resulting in insufficient lubrication.

88.    Owners and lessees further incur considerable expense in the form of increased maintenance costs from continually having to add oil to their vehicles. Even while vehicles are still under warranty, oil changes and engine oil are typically not covered so owners must pay out of pocket.

89.  FCA, through its authorized dealerships and service centers, has failed to remedy the Defect.  FCA's repairs typically consist of simply topping off or changing the oil which does not fix the problem.  The only known fix is a full engine replacement which is extremely costly if an owner is out of warranty and which FCA often refuses to perform if the car is still under warranty or lease.  Even if an owner does get an engine replacement, there is no indication the replacement engines are not susceptible to the same defect.

90.  Until the Defect is fixed by FCA, owners and lessees of Class Vehicles will continue to be at risk of dangerous engine stalling and engine damages and adding oil and frequent dealership visits will continue to be an ongoing expense and inconvenience.

91.  The Defect thus continues to pose a safety hazard as well as impacts the core functionality of the Class Vehicles.

**B.  FCA's Knowledge of the Defect**

92.  Plaintiffs' experiences are not isolated or outlier occurrences. The internet is replete with driver complaints on message boards, social media, and other websites concerning the Oil Consumption Defect.  For example, one consumer

22

started a change.org petition related to oil consumption issues in 2017 and later Jeep Compasses. To date 122 people have signed.[3]

93.    FCA had a duty to disclose the Defect due to, *inter alia*, its knowledge that the Defect poses a serious safety hazard, the fact that the Defect goes to the central functionality of Class Vehicles, its superior and exclusive knowledge of the Defect and the fact that the Defect constitutes information reasonable consumers would want to know.  Moreover, FCA actively concealed the Defect, including by telling consumers that it is normal to burn oil at a rate of 1 quart per 1,000 miles.

94.    Numerous complaints about the Defect appear on websites FCA actively monitors, such as the website for the National Highway Traffic Safety Administration ("NHTSA") and Jeep owner message boards. Consumers have made well over 1,000 complaints about the Oil Consumption Defect through NHTSA alone.[4]  Many complaints posted on social media websites such as Facebook and Twitter also tag FCA or its divisions such as Jeep in the posts. Although FCA monitors these forums, it is difficult for potential consumers to do so, giving FCA

---

[3] https://www.change.org/p/fca-us-FCA-group-make-jeep-acknowledge-and-recall-engines-with-oil-consumption-issues?recruiter=992004860&utm_source=share_petition&utm_medium=twitter&recruited_by_id=20ca52e0-bded-11e9-9821-e5d9bcefef7e

[4] Federal law requires automakers like FCA to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

exclusive knowledge of the Defect. The following are a sampling of the complaints

submitted by Class Vehicle owners and lessees which date back to at least 2013[5]:

**FROM THE NHTSA**

**September 25, 2013 NHTSA ID NUMBER: 10545374[6]**

- WAS GOING TO PICK UP MY BOYFRIEND AND WHEN 3 MILES FROM HOME OIL PRESSURE LIGHT CAME ON. I WAS ON A MAJOR HIGHWAY AND WAS TRYING TO GET TO A SAFE PULL OFF SPOT WHEN THE CAR DIED IN THE MIDDLE OF THE HIGHWAY.(THIS SECTION OF HIGHWAY WAS AN AREA OF MAJOR SEMI-TRUCK TRAFFIC) ALL THE OIL HAD DRAINED OUT OF THE VEHICLE AND HAD TO HAVE THE CAR TOWED TO DEALERSHIP.

**July 16, 2015 NHTSA ID NUMBER: 10734584[7]**

- TL\* THE CONTACT OWNS A 2015 JEEP CHEROKEE. WHILE DRIVING AT VARIOUS SPEEDS, THE LOW OIL PRESSURE AND BATTERY WARNING LIGHTS ILLUMINATED. THE VEHICLE WAS ABLE TO RESTART. THE FAILURE RECURRED SEVERAL TIMES. THE VEHICLE WAS TAKEN TO A DEALER WHO WAS UNABLE TO DIAGNOSE THE CAUSE OF THE FAILURE. THE CONTACT MENTIONED THAT THE VEHICLE WAS LOSING EXCESSIVE OIL AND CONSTANTLY NEEDED OIL TO BE ADDED. THE VEHICLE WAS THE TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE ENGINE NEEDED TO BE REPLACED. THE VEHICLE WAS

---

[5] The following complaints are reproduced as they appear online. Any typographical errors are attributable to the original author. The particular models/vehicles involved are set forth in the links in the footnotes as to the NHTSA complaints, and appear in the URL's, e.g., Jeep Cherokee, Chrysler 200, etc.

[6] https://www.nhtsa.gov/vehicle/2013/DODGE/DART/4%252520DR/FWD
[7] https://www.nhtsa.gov/vehicle/2015/JEEP/CHEROKEE/SUV/4WD

REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 4,800.

## November 13, 2015 NHTSA ID NUMBER: 10790238[8]

- CAR STALLED WHILE OPERATING UNDER FULL POWER ON THE INTERSTATE. IT TOOK APPROX. 3 MINUTES AND IT FINALLY RESTARTED. TOOK CAR TO DEALERSHIP. THEY STATE CAR IS NOT PART OF ANY RECALL BASED ON VIN #. THEY STATE STALLING WAS RESULT OF EXTREMELY LOW OIL. HOWEVER, THE CARE HAS NO LEAK AND DOES NOT BURN OIL. IT IS SYNTHETIC OIL AND IT SIMPLY BREAK DOWNS AND DISSIPATES. I DON'T BELIEVE THEM. THIS IS THE SECOND TIME THIS CAR HAS DONE THIS

## November 17, 2015 NHTSA ID NUMBER: 10793237[9]

- 2 TIMES ALREADY I HAVE HAD TO TAKE MY CAR INTO THE DEALERSHIP BECAUSE IT WOULD SHUT OFF RANDOMLY WHILE DRIVING. THIS HAS HAPPENED WHILE ON THE HIGHWAY AND ALSO WHILE ON BUSY STREETS. SO FAR I HAVE BEEN ABLE TO DRIFT TO THE SIDE OF THE ROAD, PUT THE CAR IN PARK AND THEN TURN THE CAR OFF AND BACK ON. THE CAR SPUTTERS WHEN RESTARTING AND ON MULTIPLE OCCASIONS WILL STALL AGAIN. BOTH TIMES THEY TRIED TO BLAME IT ON THE OIL CHANGE BEING OVERDUE. THE 2ND TIME I HAD TO HAVE THE CAR TOWED TO THE DEALERSHIP AND THEY STATED THERE WAS NO OIL IN THE CAR. HOW A CAR LOSES OIL IF THERE ISN'T A LEAK, I'M NOT SURE. THIS IS NOW THE THIRD TIME IT IS HAPPENING AND BASED ON THE CAR'S COMPUTER I STILL HAVE

---

[8] https://www.nhtsa.gov/vehicle/2013/DODGE/DART/4%252520DR/FWD
[9] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD

30% TO GO BEFORE NEEDING AN OIL CHANGE AND THE CAR IS SHUTTING OFF ON ME AGAIN RANDOMLY.

**January 18, 2016 NHTSA ID NUMBER: 10820830[10]**

- NEW 2015 JEEP CHEROKEE LATITUDE WITH 4K MILES ON IT SUDDENLY TURNED ITSELF OFF WHILE DRIVING DOWN THE ROAD. NO WARNING OTHER THAN A MESSAGE ON THE DASH TO PUT THE CAR IN PARK TO CHANGE GEARS. VERY DANGEROUS, LOST CONTROL OF POWER STEERING, GAS AND BRAKES. WAS ABLE TO PUT CAR IN PARK ON SIDE OF ROAD, RESTART IT AND GET HOME. IT HAPPENED AGAIN THE NEXT MORNING AND WAS TOWED TO DEALERSHIP. SERVICE DEPT. RAN ALL UPDATES AND THE CAR SHUT OFF ON THEM WHILE TESTING IT TOO. HAS BEEN IN THE SHOP FOR 2 WEEKS AND THEY SAY IT WAS DUE TO EXCESSIVE OIL CONSUMPTION AND AR REPLACING THE ENGINE.

**November 10, 2016 NHTSA ID NUMBER: 10925430[11]**

- WHEN SLOWING FOR A STOP SIGN THE CAR STALLED ONCE 5 DAYS AGO BUT RESTARTED AFTER SHUTTING DOWN AND IT WAS FINE. THEN YESTERDAY MORNING IT STALLED 3X BEFORE LEAVING MY DEVELOPMENT. I DROVE TO HAVE THE BATTERY CHECKED LOCALLY AND IT WAS OK. I DROVE TO THE DEALERSHIP WHO TOLD ME THE PROBLEM WAS BECAUSE THE OIL WAS LOW, THAT THESE CARS BURN A QUART OF SYNTHETIC OIL EVERY 2000 MILES AND "WHEN THE OIL RUNS LOW THEY SHUT OFF TO PROTECT THE CAR." WHAT?? AND HOW DANGEROUS

---

[10] https://www.nhtsa.gov/vehicle/2015/JEEP/CHEROKEE/SUV/4WD
[11] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD

**May 10, 2017 NHTSA ID NUMBER: 10984771[12]**

- AFTER WORK I GO TO START MY CAR AND THERE WAS A HARD START AND THEN MY CAR DIED. THE ENGINE FELT LIKE IT WAS GOING TO POP OUT OF THE HOOD. WELL, CHRYSLER WAS INFORMED AND MY CAR WAS TOWED NEXT DAY TO THE DEALERSHIP. MY SERVICE MAN CALLED APPROXIMATELY 45 MIN AFTER MY CAR WAS DELIVERED TO THEM EXPLAINING TO ME I WAS ABOUT 2 QUARTS LOW ON OIL. THIS IS IMPOSSIBLE I EXPLAINED TO HIM. ON THE DRIVER SIDE THERE IS A STICKER SHOWING I JUST GOT MY OIL CHANGE NOT TO LONG AGO. MY SERVICE MAN SAID THIS IS A KNOWN PROBLEM WITH THIS ENGINE.

**June 25, 2017 NHTSA ID NUMBER: 11001288[13]**

- THE ENGINE HAS BEEN STALLING WHILE IN MOTION AND SHIFTING INTO NEUTRAL. THE DEALERSHIP TOLD ME AFTER THE 2ND TIME IN FOR THIS PROBLEM THAT THE VEHICLE WAS 3.5 QUARTS LOW ON OIL AND THE ENGINE HAD SHUT OFF TO "PROTECT ITSELF" . THE CAR HAS BEEN PARKED FOR IN MY GARAGE FOR 3 DAYS, AFTER DRIVING IT FOR ABOUT 3 MILES THE CHECK ENGINE LIGHT CAME ON, UPON CHECKING IT IS AGAIN LOW ON OIL. I HAVE HAD THE CAR SERVICED AS RECOMMENDED AND DON'T UNDERSTAND THIS SUDDEN OIL USE, THERE ARE NO SIGNS OF LEAKAGE OR SMOKING, AND THE WARNING SYSTEM IS NOT INDICATING LOW OIL PRESSURE.

---

[12] https://www.nhtsa.gov/vehicle/2015/CHRYSLER/200/4%252520DR/FWD
[13] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD

**July 31, 2017 NHTSA ID NUMBER: 11011670[14]**

- THE CONTACT OWNS A 2014 JEEP CHEROKEE. WHILE DRIVING AT UNKNOWN SPEEDS, THE VEHICLE BURNED AN EXCESSIVE AMOUNT OF OIL AND STALLED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC. THE LOCAL DEALER WAS NOT CONTACTED. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND OPENED CASE NUMBER: 32089788. NO FURTHER ASSISTANCE WAS OFFERED.

**September 4, 2018 NHTSA ID NUMBER: 11124329[15]**

- ENGINE OIL AND STALLING. I WENT FOR MY 2ND OIL CHANGE 8/27/2018. THE SERVICE TECH AND A MECHANIC LISTENED WHEN I SAID THE OIL WAS BASICALLY GONE AND MY HUSBAND HAD TO ADD 2 QUARTS. I EVEN CHECKED ALL THE SYSTEM WARNINGS AND THERE IS NONE FOR LOW OIL. WHEN PULLING OUT INTO AN INTERSECTION THE CAR TOTALLY SHUT OFF AT 4 DIFFERENT TIMES. SO THE MECHANIC SAID YES THOSE 2.4 ENGINES BURN 1 QUART EACH 1000 MILES AND WHEN THE OIL IS LOW THE ENGINE WILL JUST STOP. I ASKED ABOUT WHY THERE ARE NO WARNING LIGHTS, THE MECHANIC AGAIN SAID YES THERE IS NOT ONE. HAVING A CAR JUST SHUT OFF IS SO DANGEROUS. IT COULD HAVE BEEN A TERRIBLE ACCIDENT IF ANOTHER CAR WAS COMING ANY OF THOSE 4 SHUT OFFS.

**FROM CARCOMPLAINTS.COM – 2018 COMPASSES**

---

[14] https://www.nhtsa.gov/vehicle/2014/JEEP/CHEROKEE/SUV/4WD
[15] https://www.nhtsa.gov/vehicle/2017/JEEP/COMPASS/SUV/4WD

**#159 from Putnam Valley, NY, September 12, 2019**[16]

- "On three different occasions my engine has shut off and gone into a limp mode while I am driving without any warning or indicator light activation. This has occurred while driving at high speeds and has nearly resulted in more than one multi-vehicle accidents. The parking brake engages and I am unable to restart the vehicle for several minutes thereafter. I was nearly rear ended on both occasions and had no ides what was wrong. Come to find out, there was minimal oil in the engine despite being dealer maintained in a timely fashion and well before the next oil change was due. I immediately took my 2018 Jeep Compass in for servicing where they explained they have been seeing this issue in this particular model with the 2.4 liter multi-air 4 cylinder engine. The PCV valve was replaced and they started to monitor oil usage via an oil consumption test every 500 miles. Unfortunately the PCV valve replacement did not prove to be the fix as the engine malfunctioned once again sometime around 2500 miles into the oil change. I am extremely concerned for my safety and rely on this vehicle to get me to work as I am a healthcare professional. I am shocked that a recall has not been issued after reading online just how many cases have been reported with the same make/model engine. I am lucky that I was not seriously injured and it is just a matter of time before someone is, if action is not taken. I was merging onto a 4 lane highway during rush hour traffic with no shoulder the first time this occurred. Traffic was moving at 65 miles per hour. It was absolutely frightening. This is unacceptable and is a detriment to highway and personal safety. My sales associate at the dealership is also alarmed at just how many 2018 Jeep Compass with the 2.4 liter engine are having this unequivocal hazardous issue. Something must be done asap."

**#165 from Brentwood, CA, January 16, 2020**[17]

- "2.4L multiair motor burns oil at excessive rate. New car burns 1qt of oil per 850 miles. No "low oil" indicator light. When low on oil, car stalls,

---

[16] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml
[17] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml

jolts, or shuts off. Stall generally occurs when turning at low speeds (less than 30 mph). Significant safety hazard if turning in front of oncoming traffic. Car will stall if down 2 quarts. Therefore, if you do not refill oil every 1500 miles, you risk stalling on roadways. Current vehicle has 26,000 miles. Normally add 5 quarts of oil between scheduled oil changes. Stalling has occurred approximately 10 times. Two times stall occurred in intersection, almost resulting in high speed collision from opposing traffic."

**#166 from Baden, PA, January 16, 2020[18]**

- "My car is not even 2 years old and it has completely shut down twice while driving. Very quickly a low oil pressure warning sign will flash on the dashboard, and soon after the car becomes limp and completely shuts down. It will not move and doesn't allow further driving. The dealership found my oil is low, even though I haven't even hit 2500 miles since my last oil change. They are having me come back after 500 miles to monitor oil consumption and investigate further. This is extremely frustrating and dangerous, as it has shut off when I'm on main roads with cars all around me. I'm very disappointed, as I have never had any issues with previous Jeep I've owned."

**#167 from Brantford, CA, January 16, 2020[19]**

- "The Jeep Compass 2018 car just stops in the middle of driving. There is no oil light to indicate it is low on oil. This is a serious safety hazard. This has happened twice. The car eats oil. Dealer said to drive for 2000 miles and bring it in. I am terrified of driving it. It needs a new engine"

**#171 from Porter Corners, NY, January 15, 2020[20]**

- "Two days in a row the engine shut down less then one mile into my morning commute as I was turning onto the main road out of my development. The engine shut off, the steering became difficult, and the

---

[18] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml
[19] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml
[20] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml

parking brake engaged. No warning lights came on, and nothing indicated why the car was shutting down. When taken into the dealer after the second incident in as many days, I was told the engine was low or out of oil and shutting down is a safety feature as is engaging the emergency brake in traffic. I wasn't due for an oil change for another month based on Jeep's recommended schedule, but I was forced to do one so they could verify the issue. I was also told the Compass has a new highly efficient engine and these new engines are so efficient they burn/leak oil, and I am to check my oil every 500-1000 miles and always have a quart in the car to top it off. When I asked why there wasn't a dashboard indicator the oil was low I was told the Compass does not have such an indicator. I am concerned for my safety, my family's, as well as other drivers as I do not know when the car will shut down again.

## #172 from Crystal Lake, IL, January 27, 2020[21]

- "My Jeep Compass turns off while driving. The low oil pressure light comes on and the parking break turns on in the middle of the street, more than 4 times. Took my Jeep to a dealership, they said don't worry you just need an oil change. I stated that my check oil light did not come on, the engine light did not come on, and the change your oil light did not come on. How am I supposed to know the oil pressure is low? the light only flashes for a second, until the vehicle turns off. The first couple times, I was unaware the light flashed. I was to busy trying to avoid being hit from behind. I had to turn on hazards, figure out the parking break engaged and panic. That is a hazard on the road. I inquired if there was a recall or any injuries or deaths due to the issue. The answer was not yet. The 2.4 burns oil, everyone has this problem. I don't find acceptable. I have to drive this car at least 6 more years. It is not a safe vehicle. The Jeep has died backing up in parking lot. The Jeep dies during turning both right and light on busy streets. And once, I turned left drove 4 cars length and stopped dead in traffic on a busy street."

## FROM CARCOMPLAINTS.COM – 2017 COMPASS

---

[21] https://m.carcomplaints.com/Jeep/Compass/2018/engine/engine.shtml

**#40 from Carlisle, PA, November 7, 2017**[22]

> "Engine has excessive oil consumption which causes the vehicle to just stall out. Recommended 5000 oil changes but dealers will say 3000 and to check oil every 2 days because it may need 4-5 qts between oil changes. This started within 5 months of driving it off the showroom floor. Dealer and Chrysler Corp are aware of issues but no fix has been discovered not do they care. My daughter and her 2 babies were almost killed when it just stalled exiting a major freeway and an 18 wheeler right behind her...case manager (3rd case since 2017) at fca was oh, so scary. this is a serious, deadly issue and dealers omit things from the system, perform the consumption tests improperly or donT record them at all so they will not have to do what's right. The vehicle will totally shut down while turning, emergency brake will apply and it takes a bit to get it started again. Sometimes lights on dash will all flash on or sometimes just the oil light (even within 2 weeks of an oil change)."

## CARPROBLEMZOO.COM

**2018 Jeep Compass, failure date 5/15/2019**[23]

- "The engine burns oil at an extremely fast rate. Every 3,000 miles there is no oil left in the car and the car will stall out while driving with no warning. It is an extreme safety hazard and somebody is going to get killed if this happens at the wrong time."

**2018 Jeep Compass, failure date 6/1/2019**[24]

- "While driving down the freeway at about 65 miles per hour, without warning this Jeep stalls, putting my wife in a potentially fatal or injurious accident situation. Dealership said they know and accept as normal this brand new car burning a quart of oil every 2000 miles and that if the car gets low on oil it will quit running, but they never tell the owner of the car, they only say come back in 5000 miles for next oil change, meanwhile the car starts stalling at 3-4000 miles."

---

[22] https://www.carcomplaints.com/Jeep/Compass/2017/engine/engine.shtml
[23] https://www.carproblemzoo.com/jeep/compass/engine-burning-oil-problems.php
[24] https://www.carproblemzoo.com/jeep/compass/engine-burning-oil-problems.php

**FROM CARCOMPLAINTS.COM – 2015 JEEP RENEGADE**

**JM., Antioch, IL, December 1, 2017:[25]**

- "After running almost out of oil, NO OIL PRESSURE, car had to be towed in. NO Charge for the tow. Dealer changed oil, claimed oil was dirty. Charged me for the oil change. They added a die to the oil. This would help show any leaks that might occur. They told me to drive it for 1,000 miles then bring it back. I brought it back, and it was almost 1 quart low. According to them, that is normal. There are no leaks anywhere. This car is supposed to go 5,000 miles between oil changes. HOW IS THAT POSSIBLE IF IT BURNS A QUART EVERY 1,000 MILES."

**JEEP RENEGADE - JEEPRENEGADEFORUM.COM**

**Sheepdoggie, 9 months ago[26]**

- "I have had the same exact issue with my 2018 Jeep Renegade Limited. It comes down to safety. New cars stalling while driving without any warning is a definite problem. Being bone dry on oil every couple thousand miles and no safety indicators equals a very unsafe/unreliable car. I have read so many carbon copies of the same exact problem. My car stalled in traffic while turning on several occasions beginning at 2,300 miles. Filled it with oil and it began stalling again at 5,500. No warnings, no indicators.

**Mcsebs76, four months ago [27]**

- "I have had my 2017 jeep renegade at 2 different dealerships for them both to tell me the same thing. by the time i get it into the shop after doing the same thing you are saying, they tell me nothing is wrong. Let's do yet

---

[25]https://www.carcomplaints.com/Jeep/Renegade/2015/engine/excessive_oil_consumption.shtml
[26]https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-3
[27]https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-6

another oil consumption test that they are going to tell me that it is consuming the correct amount of oil for this particular jeep engine. The dealership told me yesterday that because the 2.4 engine was made to use 0W 20 oil, it is very thin and uses more. They want me to come in for another oil consumption test and have it checked every 1000 miles for the 5000 miles. That means i have to find the time to get to the dealership 5 times to get this done. Just so they have documentation in case something happens to the motor it is documented. Otherwise, I need to check my oil every time i fill up the gas tank and add oil when necessary."

### Jen d, 3 months ago[28]

- "I am having the same problem with my 2018 Renegade. They keep telling me to get an oil change and it will fix. It works for maybe 1000-2000 miles into my oil change and the same problem happens. They car stalls out without warning. It happened the other day in a high traffic area and I came within inches of getting hit. I don't feel safe at all in this car but if I trade it in I will take a huge loss. The dealer I bought the Jeep at is no help and neither is Jeep themselves. It seams like a common problem for a lot of people. Something should be able to be done. Obviously there is a problem somewhere"

### Aqualoon, 28 days ago[29]

- "2017 Trailhawk, bought new in 2018, has 40k miles on.

  This just happened to me on my way into work, going 65 on the highway and the engine dies/stalls. 7 times out of 10 I would have been in an accident on this road (speed limit is 60 but people will ride you if you go under 70) and was very lucky. Took 3-4 times to get it restarted and it drove just fine into work. Before, during and after this there was no

---

[28]https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-5
[29]https://www.jeeprenegadeforum.com/threads/class-action-burning-oil-engine-dying.91513/page-6

indicator lights on the dash - nothing. Last oil change was in mid December.

And no, I don't check my oil at every fuel up, nor do a lot of people as I rarely ever see anyone with their hood up at the gas station while they're fueling. I called my nearest Jeep dealership and spoke with a technician, he knew of the issue right away and just said to top it off. Said that these things burn through oil like that and that was that. I'll be topping it off and then getting my oil changed this afternoon. And from now on checking it every month and keeping a spare quart or two in my vehicle."

## CARPROBLEMZOO.COM

### 2016 Jeep Renegade, failure date 6/21/2019[30]

- "Driving down a long winding hill when acceleration and brakes went out. I was able to stop the car with the emergency brake. No warning lights before or during. Towed to dealership where I was told that it had burned through 4 quarts of oil and that I needed to take it back to do an oil consumption test. There is no way I'm getting back into a vehicle that has no brakes during safe mode and has no warning that anything is wrong. Jeep needs to get these off of the road before it kills someone."

### 2016 Jeep Renegade, failure date 11/3/2018[31]

- "Around 40,000 miles my car started consuming oil at an alarming rate. The dealership service department said it was normal for my car to consume 1 quart per 750 miles! that is insane. That said, FCA guideline for cars is 1 quart per 2000 miles for cars below 50,000 miles. The dealership has refused to repair my engine. I can't even go 2500 miles on an oil change without my car seizing up, stalling, having errors codes (low oil pressure, oil light comes on, electrical error), won't accelerate over 35 miles per hour. This all happens while I'm driving with no warning! very

---

[30] https://www.carproblemzoo.com/jeep/renegade/2016/engine-burning-oil-problems.php
[31] https://www.carproblemzoo.com/jeep/renegade/2016/engine-burning-oil-problems.php

dangerous on a freeway! even the guideline for cars over 50,000 miles the guideline being the car can burn 1 quart every 750 miles is ridiculous. I've owned older models that never did that. Is this a new car thing? new cars just burn ridiculous amounts of oil? to what end?."

## 2016 Jeep Renegade, failure date 10/23/2019[32]

- "Update to complaint # 11270456 reported on 10/23/19. I called Jeep directly to report the issue and they instructed me not to pick the car. They called dealership directly. They are aware of an "oil consumption issue" with 2016 Renegades which is related to the car stalling/going into neutral and the gear shifting issue. Since they did an oil change on 10/22/19, they want me to put 1,000 miles on the car & bring it back for an oil consumption test. Depending on the results of that test, they may have to replace the engine."

## JEEP CHEROKEE - CARPROBLEMZOO.COM

## 2016 Jeep Cherokee, failure date 8/5/2016[33]

- "We bought a brand new Jeep and by 5168 miles it used 3 quarts of synthetic oil. We had the oil changed at 3000 miles at the dealer(as they suggested). We informed the dealer that the Jeep was burning oil not leaking oil. We were told that FCA would not do anything about it until 7500 miles and then they would do a oil consumption test on the Jeep and after that we would have to bring it back every 500 miles to top the oil off if necessary. Synthetic oil is about $8. 00 a quart. This Jeep is under warranty but they wouldn't fix it. And we would of had to pay for the oil to top it off with too. The dealer was aware of this problem with these Jeeps. Our daughter bought a Jeep with the same engine but she hasn't had a problem with hers. When we told the dealer this they said this problem exists only with some of the engines. Why isn't there a recall on these! why

---

[32] https://www.carproblemzoo.com/jeep/renegade/2016/engine-burning-oil-problems.php
[33] https://www.carproblemzoo.com/jeep/cherokee/2016/engine-burning-oil-problems.php

are they even selling these when they know there's a problem. Since the manufacture wouldn't fix the problem we got rid of the Jeep."

## CARCOMPLAINTS.COM – 2017 CHEROKEE

### Solangel N., Tuscon, AZ, May 5, 2019[34]

- "Car ran out of oil at ~5K miles after having served at the dealers. They told me it is a known problem with Cherokees: Excessive Oil Consumption. Then why do they keep selling them!!!!!

  My car completely stalled as I was going to enter the ramp to the I10. It could have been very bad if it happened once I entered the I10. I had my 1 year old with me in the scorching hot sun of Tucson Arizona waiting for a tow truck.

  They are doing oil consumption tests now on my vehicle. This is the second one. The first one they said the consumption looked normal. Then why in the world did my car run out of oil?"

### Louis G., Stockton, May 1, 2019[35]

- "Makes dinging sounds when turning right or left, Car dies out when making turns , no oil on dip stick, need to constantly add oil about every two weeks, have taken to dealership and they told me that is just the way that these jeeps are.... and that I need to keep checking the oil consumption, just doesn't seem right, I always had high expectations for jeep, but now I am not to sure anymore, especially when I found out that a lot of people are going through the same issue and Jeep is aware of it and not recalling these vehicles"

## CARCOMPLAINTS.COM – 2016 CHEROKEE

---

[34] https://www.carcomplaints.com/Jeep/Cherokee/2017/engine/excessive_oil_consumption.shtml
[35] https://www.carcomplaints.com/Jeep/Cherokee/2017/engine/excessive_oil_consumption.shtml

**Andrew R., Mooresville, NC, November 1, 2017[36]**

- "When the vehicle was under 50k miles it was burning a quart every thousand miles, which FCA said was acceptable. They advised oil change intervals at 5000 miles and the oil capacity is five quarts. Now that it has over 50k on it, they advised it's acceptable to burn a quart every 750 miles. The dealership won't work with me and FCA told me it was the TRANSMISSION that is causing it to burn oil!"

**Robert I. in Severna Park, MD, May 26, 2017[37]**

- "I purchased a 2016, Jeep Cherokee with 20,211 miles on it. At 24,311 the oil light comes on when taking a turn. I stop and check the oil level and the Jeep is 3.5 qts low! I fill it up and then change the oil/filter. I called Jeep and currently am running a Consumption Test through the dealership where I was also told 1 quart 1000 miles is acceptable. I'm selling it if it can't be fixed. Stay tuned .....

  Update from Jun 18, 2017I completed by oil consumption test with Tate Jeep of Glen Burnie, MD. In 2 weeks we put 1050 miles on the 2016 Jeep Cherokee. Jeep said 1 qt in 2000 miles is too much for a vehicle with less than 50K miles. They performed a cylinder wall examination and said there was severe scoring of at least 2 cylinder walls. They submitted a request to Jeep Corporate for an engine replacement and it was accepted within a day. Jeep then ordered and replaced the engine 2 days later! Yea Jeep!"

**Kathie T. in Anaheim, December 10, 2018[38]**

- "We have had our Cherokee for 2 1/2 years. We had the engine replaced at 20k miles due to severe scoring of the cylinder walls as a result of oil consumption causing the car to shut off/stall. NOW... 23k miles later we are replacing the engine AGAIN! The car was taken in due to battery losing charge thinking it was the alternator. NOPE, they checked the cylinder

---

[36] https://www.carcomplaints.com/Jeep/Cherokee/2016/engine/excessive_oil_consumption.shtml
[37] https://www.carcomplaints.com/Jeep/Cherokee/2016/engine/excessive_oil_consumption.shtml
[38] https://www.carcomplaints.com/Jeep/Cherokee/2016/engine/excessive_oil_consumption.shtml

walls of the engine and found scouring again as well as oil gathering where the spark plugs are and he called it "blow-by". This is CRAZY! I want an old car with a heavy solid engine!"

## CARCOMPLAINTS.COM – 2017 CHEROKEE

### rbriggs, Hamilton, March 12, 2018[39]

- "Car was purchased new May of 2017. Now 10 months old, (6,960 miles) Jeep dinging at random, no warning lights or messages noticed on dash. Prior to this (approx. 6,500 miles) we called the dealer to see what the oil change warning would be ,the owners manual was not helpful, (in the past we changed the oil every 3000 miles on other cars). We were told that the car would tell us on the dash when an oil change was due.

  At 6,990 miles the car stalled, 2 tries later it started. There were no visible warning lights.

  Called the dealer to get it checked out and to go ahead and change the oil also. We were told by service that the oil dipstick was dry. They were aware of a problem with another customer that this particular engine has had problems with excessive oil consumption and their engine was replaced after 2 months of documentation with FCA. We will have to take the car in every 1,000 miles for documentation (looking for engine scoring) for FCA to move forward with this problem.

  Our annoyance is if FCA/Jeep has been aware of this problem for two years at least, why are they still selling these vehicles and there is no recall. Are there not enough injuries or deaths to get their attention?? Do they just say "Sorry about your Luck ! " ( If you were a patient in the operating room would you want that motto ? OOPS, sorry about your luck !!) There is nothing shown for Our inconvenience. This makes us feel that we have a new car with limited sense of confidence to drive it.. FCA/Jeep needs to show us that they care about this problem.

---

[39] https://www.carcomplaints.com/Jeep/Cherokee/2017/engine/excessive_oil_consumption.shtml

Update from Mar 14, 2018 Car stalled while driving.

Update from Sep 10, 2018 After several trips back for service the engine was replaced in May. It is now September and the car is going back in due to oil consumption on the 2nd engine. Buyer beware 2.4 liter engines!"

## CARCOMPLAINTS.COM – 2014 CHEROKEE

### Jason W, Toms River, NJ, June 17, 2015[40]

- "So I've been reading that this is a problem with the particular Jeep and even the dealer admits it and can do nothing for me. I've had the Jeep go bone dry and shut down after 5k miles on multiple occasions prior to realizing this was an ongoing issue. This time I had the oil changed 3200 miles ago and the engine seized this morning. If this happened on the highway I could see it resulting in injury or death. The manufacturer does nothing, the dealer does nothing. I'm told for them to do anything it has to meet lower then whatever the standard were for a vehicle to burn which was something like a quart per 1k miles. This time around it did and I imagine it's not going to be improving. Don't buy this year Jeep and I think 2015 has the same problems."

### Enrique G., Destrehan, June 26, 2017[41]

- "READ THIS BEFORE BUYING THIS CAR!!

My engine started burning oil at around 40,000 miles (that I could notice). It burned so much in between oil changes that the engine SHUT DOWN in the middle of the road with NO WARNING. It had consumed all the oil to empty in about 6000 miles. I took it to the dealer who recommended to Chrysler that the engine be replaced. Chrysler responded that it did not approve the procedure because "WE HAVE NO REASON TO CHANGE. NEEDS TO

---

[40] https://www.carcomplaints.com/Jeep/Cherokee/2014/engine/excessive_oil_consumption.shtml
[41] https://www.carcomplaints.com/Jeep/Cherokee/2014/engine/excessive_oil_consumption.shtml

BE AT 1000 MILES PER QUART" this quote is from the reports I received with my invoice. In conclusion, they did nothing because per Chrysler, THEIR ENGINES ARE OK IF THEY CONSUME UP TO 1 QUART OF OIL FOR EVERY 1000 MILES. This means I have to add up to 6 quarts of oil in between oil changes. Per the dealer recommendation, I should keep oil in my car and check the oil every time I add gas. Is this normal for a 3-year old, 50,000 mile car??? I would recommend to stay away unless you are willing to take the risk on the engine."

## CARCOMPLAINTS.COM – 2016 DODGE DART

### #11 from Kissimmee, FL, December 10, 2017[42]

- "The contact owns a 2016 Dodge Dart. In October of 2016, while driving 25 mph, the vehicle stalled without warning. The vehicle was taken to a local dealer where it was diagnosed that there was inadequate oil in the vehicle during production, which caused the sensor to shut the vehicle down. The vehicle was repaired, but the failure recurred. While driving 40 mph, the oil indicator was flashing. The vehicle was taken back to the dealer where a compression test was completed. The dealer diagnosed that the oil was evaporating and the engine needed to be replaced. The vehicle was not repaired. The manufacturer was notified of the failure and denied the claim. The manufacturer advised the contact to add oil and refer to the owner's manual. The failure mileage was 15,638."

## CARCOMPLAINTS.COM – 2015 CHRYSLER 200

### #226 from Bellevue, OH, July 17, 2017[43]

- "My husband and I went on a trip from bellevue, Ohio to fort wayne, Indiana. Around 300 miles round trip, give or take. My husband checked the oil before we left and it was fine. No problems on the ride there. After the car sat for 3-4 hours we were leaving the park, going down a hill with a curve at the bottom and the car just dies. No steering and no brakes. All

---

[42] https://www.carcomplaints.com/Dodge/Dart/2016/engine/engine-2.shtml
[43] https://www.carcomplaints.com/Chrysler/200/2015/engine/engine-12.shtml

the lights on the dash came on. We had no idea what was going on. We almost hit a camper. The only thing that stilled worked was the radio. The car finally stops on its own. My husband puts it in parking and checks on the outside of the car to make sure we didn't hit anything. When he true to start the back up, it struggles the first two tries. The third time it turned over. No lights on dash to explain the stall. We nervously drive the car all the way home. I called the dealership the next morning. We took the car in to be checked out. Dealership had the car over night. We go in to pick up our car and they tell us that they had to put 3 3/4 quarts of oil in it. It being low on oil caused the safety feature in the car to shut the engine down. Didnt know about this feature. We were also informed that since our car had over 50,000 it will burn through a quart of oil every 750 miles..seriously."

## TWITTER

### Saltyred @Jeep, February 28, 2020[44]

- "when are yall going to fix the 42herokee42 from not burning oil and shutting off when people are driving them??? This is very dangerous and needs to be addressed immediately. Coming from an owner of a 2019 Jeep Cherokee whose oil is burning bad and just randomly shut off"

### Amy Sue, February 13, 2020[45]

- "I bought a new @Jeep Cherokee thinking I was getting a safe, reliable vehicle for me and my two young children. Little did I know my jeep would have major oil consumption issues and shut off with me and my children in the middle of a busy highway with no warning."

### Brian S @bmsmithvb @Official MOPAR @NHTSAgov @FiatFCA NA, December 24, 2019[46]

---

[44] https://twitter.com/saltyred_mxr/status/1233461642761003009
[45] https://twitter.com/amyrenaewright/status/1228112267637641218
[46] https://twitter.com/bmsmithvb/status/1209513934862110727

- "How is it safe when my 2018 Jeep Cherokee Limited just dies in the middle of the road? I am under the factory recommended 3,500 mile oil change. Several thousands of others online are reporting the same. Is anyone investigating this?"

**Dan @corrigda25, February 11, 2020[47]**

- "Don't buy a 2019 @Jeep 43herokee. The engine burns oil and this causes the engine to stall. When I called, the only thing @FCA and @Jeep could recommend is to carry extra oil in the car. They also claim its normal for the engine to stall. I would never recommend buying a Jeep"

95. In addition to being on notice of the Oil Consumption Defect through NHTSA and other online complaints which date back to at least 2013, FCA also directly learned of the widespread oil consumption problems from its network of dealerships. Many of the customers who wrote online or to FCA about their bad experiences with the Defect report having taken their Class Vehicles into FCA dealerships because of the Defect. Upon information and belief, FCA began to see complaints related to the Defect through its dealers as early as 2012 when it began selling the 2013 model-year Class Vehicles.

96. Confirming its knowledge and concealment of the Defect, FCA and its dealerships often tell drivers that it is normal for Class Vehicles to burn up to 1 quart of oil every 750-1,000 miles even though, as described above, this directly conflicts with FCA's own recommended maintenance schedule.

---

[47] https://twitter.com/corrigda25/status/1227418580008013826

43

97.    Despite its knowledge of the Oil Consumption Defect, FCA failed to disclose it to Plaintiffs and other Class Members. FCA could have provided Class Vehicle owners and lessees with adequate and satisfactory notice of the Defect, including through its network of dealers, in owners' manuals, on its website, in Class Vehicle brochures, and on Class Vehicle Monroney stickers. Had FCA disclosed the Defect in any of these places, reasonable consumers would have been aware of it.

98.    The Oil Consumption Defect first manifested in the 2013 Dodge Dart and then several 2014 model year vehicles.  Despite receiving complaints from drivers of these vehicles, FCA continued to design, manufacture, and sell six additional model years of cars across five different brands with the same engine and therefore the same Defect and without informing prospective buyers about the Defect. In fact, FCA continues to put the same defective engine in new vehicles.

99.    Not only did FCA continue to put the same defective engine into many successive model years, but it debuted several entirely new vehicles within this time period. For example, FCA introduced the Jeep Compass for the 2017 model year. After four years of mounting complaints about the Defect in other FCA vehicles, as well as the additional prerelease testing that would go into the launch of a an entirely new vehicle, FCA clearly knew about the Defect before it launched the Jeep Compass.  On information and belief, there are no significant differences between the engines as installed in the Class Vehicles or in the way in which they are installed

that would impact oil consumption as between the different models of Class Vehicles.

100. Despite its long-running knowledge of the Oil Consumption Defect, FCA still does not inform prospective buyers about the Defect. Nor has FCA developed an effective fix for the oil consumption problem it causes.

101. As a consequence of FCA's action and inaction, Class Vehicle owners have been deprived of the benefit of their bargain, subjected to hazardous engine stalling risks, and incurred lost time and out-of-pocket costs from frequent dealership visits and increased maintenance costs. Class Vehicles also have suffered a diminution in value due to the Defect.

102. Had Plaintiffs and Class Members known about the Defect, they would not have purchased or leased their Class Vehicles or would have paid significantly less in doing so.

## TOLLING OF STATUTES OF LIMITATIONS

103. Because the Oil Consumption Defect cannot be detected until it manifests, Plaintiffs and Class Members were not reasonably able to discover the problem until after purchasing or leasing their Class Vehicles, despite exercising due diligence.

104. Plaintiffs and Class Members had no realistic ability to discover that the engine was defective until it prematurely failed or began exhibiting oil consumption

problems and would have no reason to believe that the issues they were experiencing

were caused by a widespread, systemic defect.  Therefore, the discovery rule is

applicable to the claims asserted by Plaintiffs and Class Members.

105.  As alleged herein, FCA has known about the Oil Consumption Defect

since at least 2012 and has failed to disclose and actively concealed the existence of

the Defect to consumers.  Therefore equitable tolling of statute of limitations is also

applicable to the claims asserted by Plaintiffs and Class Members.

## CLASS ACTION ALLEGATIONS

106.  This action is brought and may be maintained as a class action, pursuant

to Rules 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure.

107.  The Class is defined as follows:

> All persons in the United States who bought or leased, other than for
> resale, a Class Vehicle (including 2014-2020 Jeep Cherokees, 2015-
> 2020 Jeep Renegades, 2017-2020 Jeep Compasses, 2013-2016 Dodge
> Darts, 2015-2020 Ram ProMaster City's, 2015-2016 Chrysler 200's,
> and 2016-2020 Fiat 500X's).

108.  In addition, state subclasses are defined as follows:

> **California Subclass**
> All persons in the state of California who bought or leased, other than
> for resale, a Class Vehicle.
>
> **New Jersey Subclass**
> All persons in the state of New Jersey who bought or leased, other than
> for resale, a Class Vehicle.
>
> **New York Subclass**

All persons in the state of New York who bought or leased, other than for resale, a Class Vehicle.

### Maryland Subclass

All persons in the state of Maryland who bought or leased, other than for resale, a Class Vehicle.

### Pennsylvania Subclass

All persons in the state of Pennsylvania who bought or leased, other than for resale, a Class Vehicle.

### North Carolina Subclass

All persons in the state of North Carolina who bought or leased, other than for resale, a Class Vehicle.

109. Excluded from the Class are FCA, its affiliates, employees, officers and directors; persons or entities that purchased the Class Vehicles for resale; and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the class definitions in light of discovery and/or further investigation.

110. **Numerosity**: The Class is so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Class is unknown at this time, as such information is in the sole possession of FCA and is obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that at least hundreds of thousands of Class Vehicles have been sold and leased nationwide. Members of the Class can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, and dealership records and files) maintained by FCA in connection with its sales and leases of Class Vehicles.

47

111. **Existence and Predominance of Common Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

      a.      whether FCA engaged in the conduct alleged herein;

      b.      whether Class Vehicles are defective;

      c.      whether FCA placed Class Vehicles into the stream of commerce in the United States with knowledge of the Defect;

      d.      whether FCA knew or should have known of the Defect, and if so, for how long;

      e.      when FCA became aware of the Defect in the Class Vehicles;

      f.      whether FCA knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

      g.      whether FCA's conduct alleged herein violates consumer protection laws, warranty laws, and other laws as asserted herein;

      h.      whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect;

      i.      whether Plaintiffs and Class Members have suffered an ascertainable loss as a result of their loss of their Class Vehicles' features and functionality;

j.      whether Plaintiffs and Class Members are entitled to damages, including punitive damages, as a result of FCA's conduct alleged herein, and if so, the amount or proper measure of those damages; and

k.      whether Plaintiffs and Class Members are entitled to equitable relief, including but not limited to restitution and/or injunctive relief.

112. **Typicality**: Plaintiffs' claims are typical of the claims of the Class because the Plaintiffs purchased or leased a Class Vehicle containing the Defect, as did each member of the Class. Plaintiffs and Class Members were economically injured in the same manner by FCA's uniform course of conduct alleged herein. Plaintiffs and Class Members have the same or similar claims against FCA relating to the conduct alleged herein, and the same conduct on the part of FCA gives rise to all the claims for relief.

113. **Adequacy**: Plaintiffs are adequate representatives of the Class, whose interests do not conflict with those of any other Class Member. Plaintiffs have retained counsel competent and experienced in complex class action litigation—including consumer fraud and automobile defect class actions—who intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

114. **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.

The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of these claims, including from the need for expert witness testimony on the technical and economic aspects of the case. Individualized litigation also would risk inconsistent or contradictory judgments and increase the delay and expense to all parties and the courts. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

115. **Injunctive Relief**: FCA has acted, and refuses to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code §§ 1750–1785**
**Plaintiffs Schmid Individually and on Behalf of the California Subclass Who Purchased or Leased a Class Vehicle for Personal Use**

116. Plaintiff Schmid incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

117. Plaintiffs Schmid brings this claim individually and on behalf of the California Subclass members who purchased a vehicle for personal, family, or household use.

118. Plaintiffs Schmid and the members of the California Subclass are "consumers" as defined under the CLRA. *See* Cal. Civ. Code § 1761(d).

119. FCA is a "person" as defined under the CLRA. *See* Cal. Civ. Code § 1761(c).

120. Class Vehicles are "goods" as defined under the CLRA. *See* Cal. Civ. Code § 1761(a).

121. The CLRA proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

122. FCA engaged in unfair and deceptive acts in violation of the CLRA by the practices described above and by knowingly and intentionally concealing from Plaintiff and the California Subclass members that the Class Vehicles suffer from the Oil Consumption Defect (and the costs, risks, and diminished value of the Class Vehicles as a result of this Defect). FCA's conduct violated at least the following enumerated CLRA provisions:

a.    FCA represented that the Class Vehicles have characteristics, uses, or benefits that they do not have, which is in violation of section 1770(a)(5);

b.    FCA represented that the Class Vehicles are of a particular standard, quality, or grade when, in fact, they are not, which is in violation of section 1770(a)(7);

c.    FCA advertises its Class Vehicles with the intent not to sell them as advertised, which is in violation of section 1770(a)(9);

d.    FCA represents that its Class Vehicles have been supplied in accordance with a previous representation when they have not, which is in violation of section 1770(a)(16); and

e.    FCA inserts an unconscionable provision into its warranty in violation of section 1770(a)(19).

123.  FCA's unfair or deceptive acts or practices occurred repeatedly in its trade or business, were capable of deceiving a substantial portion of the purchasing public, and created a serious safety hazard for the public.

124.  FCA knew, should have known, or was reckless in not knowing that the Class Vehicles were defective, posed a safety hazard, would fail prematurely, and were not suitable for their intended use.

125.  FCA was under a duty to Plaintiff and the California Subclass members to disclose the defective nature of the Class Vehicles and the Defect because:

a.    FCA knew of but actively concealed the Defect from Plaintiff and the California Subclass;

b.  FCA was in a superior and exclusive position to know the true facts about the Defect, which poses serious safety hazards and affects the central functionality of the vehicle, and Plaintiff and the Subclass members could not reasonably have been expected to discover that the Class Vehicles contained the Defect until it manifested, which FCA knew; and

c.  FCA made partial representations regarding the reliability, safety, and quality but suppressed facts regarding the Defect.

126.  The facts that FCA misrepresented to and concealed from Plaintiff and the other California Subclass members are material because a reasonable consumer would have considered them to be important in deciding whether to purchase their Class Vehicles or pay a lesser price for them.

127.  The Defect poses a serious safety defect and affects the central functionality of a vehicle because it renders the vehicle inoperable.

128.  In failing to disclose the material Defect, FCA has knowingly and intentionally concealed material facts in breach of its duty to disclose.

129.  Plaintiff Schmid and the California Subclass have suffered injury in fact and actual damages resulting from FCA's material misrepresentations and omissions, including by paying an inflated purchase price for their Class Vehicles and incurring additional out-of-pocket expenses to deal with the Defect. Had Plaintiff Schmid and the Subclass known about the defective nature of the Class Vehicles and the Defect, they would not have purchased or leased their Class Vehicles or would have paid less in doing so.

130. As a direct and proximate result of FCA's unfair and deceptive conduct, therefore, Plaintiff and the California Subclass members have been harmed.

131. Pursuant to Cal. Civ. Code § 1782(a), On April 29, 2020, Plaintiff Schmid sent a demand letter to FCA notifying it of its CLRA violations and providing it with an opportunity to correct its business practices. If FCA does not correct its business practices, Plaintiff Schmid will amend (or seek leave to amend) the complaint to add claims for monetary relief, including for actual, restitutionary, and punitive damages under the CLRA.

132. Pursuant to Cal. Civ. Code § 1780(a), Plaintiffs Schmid, individually and on behalf of the California Subclass, seeks injunctive relief for FCA's violation of the CLRA.

133. Additionally, pursuant to Cal. Civ. Code §§ 1780 and 1781, Plaintiff Schmid, individually and on behalf of the California Subclass, seek compensatory and punitive damages under the CLRA and to recover attorneys' fees and costs.

134. Plaintiff's CLRA venue declaration is attached as Exhibit 1 to this complaint in accordance with Cal. Civ. Code § 1780(d).

## COUNT II
### Violations of the California Unfair Competitions Law ("UCL")
### Cal. Bus. & Prof. Code §§ 17200–17210
### Plaintiff Schmid, Individually and on Behalf of the California Subclass

135. Plaintiff Schmid incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

136. Plaintiff Schmid brings this claim individually and on behalf of the California Subclass.

137. The UCL proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. FCA's conduct violates each of these prohibitions.

### Unlawful Conduct

138. FCA's conduct is unlawful, in violation of the UCL, because, as set forth herein, it violates the Song–Beverly Consumer Warranty Act, the MMWA, and the CLRA.

### Unfair Conduct

139. FCA's conduct is unfair because it violated California public policy, legislatively declared in the Song–Beverly Consumer Warranty Act, which requires a manufacturer to ensure that goods it places on the market are fit for their ordinary and intended purposes. The Defect renders the Class Vehicles unsafe, unreliable, and inoperable.

140. FCA acted in an immoral, unethical, oppressive, and unscrupulous manner, in at least the following respects:

      a.     Knowingly selling Plaintiff Schmid and California Subclass members Class Vehicles with the Defect;

      b.     Directing and furnishing replacement parts it knew would not adequately remedy the defect, and repairing defective parts with more defective parts and otherwise failing to adequately remedy the Defect during the warranty period;

      c.     Refusing to repair or replace the Class Vehicles when the known Defect manifested outside the warranty period;

      d.     Failing to exercise adequate quality control and due diligence over the Class Vehicles before placing them on the market; and

      e.     Failing to acknowledge the scope and severity of the Defect, which poses serious safety concerns, refusing to acknowledge the Class Vehicles are defective, and failing to provide adequate relief.

141. The gravity of the harm resulting from FCA's unfair conduct outweighs any potential utility of the conduct. The practice of selling defective Class Vehicles without providing an adequate remedy to cure the Defect harms the public at large and is part of a common and uniform course of wrongful conduct.

142. There are reasonably available alternatives that would further FCA's business interests of increasing sales and preventing false warranty claims. For example, FCA could have: (a) acknowledged the Defect and provided a permanent,

effective fix for the Defect; and/or (b) disclosed the Defect prior to prospective consumers' purchases.

143. The harm from FCA's unfair conduct was not reasonably avoidable by consumers. The Class Vehicles all suffer from the latent Defect, and FCA has failed to disclose it. Plaintiff and California Subclass members did not know of, and had no reasonable means of discovering, the Defect.

## Fraudulent Conduct

144. FCA's conduct is fraudulent in violation of the UCL. FCA's fraudulent acts include knowingly and intentionally concealing from Plaintiff and the California Subclass members the existence of the Defect and falsely marketing and misrepresenting the Class Vehicles as being functional, reliable and safe.

145. FCA's misrepresentations and omissions alleged herein caused Plaintiff and the California Subclass members to purchase or lease their Class Vehicles or pay more than they would have had FCA disclosed the Defect.

146. At all relevant times, FCA had a duty to disclose the Defect because it had superior and exclusive knowledge of the Defect, which affects the central functionality of the vehicle and creates a safety risk for drivers and passengers, and because FCA made partial representations about the reliability, quality, and safety of the Class Vehicles but failed to fully disclose the Defect.

147. Accordingly, Plaintiff Schmid and California Subclass members have suffered injury in fact, including lost money or property, as a result of FCA's unlawful, unfair, and fraudulent acts. Absent these acts, Plaintiff Schmid and California Subclass members would not have purchased or lease their Class Vehicles at the prices they paid or would not have purchased or leased them at all.

148. Plaintiff Schmid seeks appropriate relief under the UCL, including such orders as may be necessary: (a) to enjoin FCA from continuing its unlawful, unfair, and fraudulent acts or practices, and (b) to restore Plaintiff and California Subclass members any money FCA acquired by its unfair competition, including restitution. Plaintiff also seeks reasonable attorneys' fees and expenses under applicable law.

## COUNT III
### Violations of the New Jersey Consumer Fraud Act ("NJCFA")
### N.J. Stat. Ann. §§ 56:8-1–56:8-20
### Plaintiff Munoz, Individually and On Behalf of the New Jersey Subclass

149. Plaintiffs incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

150. Plaintiff Munoz brings this claim individually and on behalf of the New Jersey Subclass.

151. The NJCFA protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or

58

omission, in connection with the sale or advertisement of any merchandise." N.J. Stat. Ann. § 56:8-2.

152. Plaintiff Munoz and the New Jersey Subclass members are consumers who purchased or leased Class Vehicles for personal, family, or household use.

153. In the course of FCA's business, it knowingly concealed, suppressed, and omitted the fact that the Class Vehicles are defective, with the intent that Plaintiff Munoz and the New Jersey Subclass members rely upon that concealment, suppression, and omission when purchasing or leasing Class Vehicles. The existence of the Defect is material to a reasonable consumer in that: (1) it poses a serious risk to their and their passengers' safety; (2) it adversely affects the central functionality of the vehicle; (3) it causes the Class Vehicles to be worth substantially less than they would otherwise be valued; and (4) it causes consumers to incur higher than expected maintenance and service costs.

154. FCA has engaged in unfair and deceptive trade practices, including: representing that the Class Vehicles have characteristics, uses, benefits, and qualities that they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive. Further, FCA's acts and practices described herein offend established public policy because: (a) the harm they cause to consumers, motorists, and passengers outweighs any

benefit associated with such practices, and (b) FCA fraudulently concealed the defective nature of the Class Vehicles from consumers.

155. FCA's actions set forth above occurred in the conduct of trade or commerce.

156. FCA's conduct caused Plaintiff Munoz and the New Jersey Subclass members to suffer ascertainable loss. Plaintiff Munoz and the New Jersey Subclass members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their vehicles suffered a diminution in value. In addition, Plaintiff Munoz and the New Jersey Subclass members have incurred out-of-pocket expenses for maintenance/service expenses to temporarily fix the Defect.

157. Plaintiff Munoz and the New Jersey Subclass members' damages are the direct and foreseeable result of FCA's unlawful conduct. Had FCA disclosed the Oil Consumption Defect, consumers would not have purchased or would have paid substantially less for the Class Vehicles and would have been spared the subsequent expenses and inconvenience.

158. Plaintiff Munoz and the New Jersey Subclass members are entitled to recover treble damages, attorneys' fees and reasonable costs. N.J. Stat. Ann. § 56:8-19.

159. Pursuant to N.J. Stat. Ann. § 56:8-20, Plaintiffs will serve the New Jersey Attorney General with a copy of this Complaint.

## COUNT IV
### Violations of the New York General Business Law
### N.Y. Gen. Bus. Law § 349 ("NYGBL § 349")
### Plaintiff McCall, Individually and on Behalf of the New York Subclass

160. Plaintiff McCall incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

161. Plaintiff McCall brings this claim individually and on behalf of the New York Subclass.

162. NYGBL § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

163. In the course of FCA's business in the conduct of trade or commerce, it willfully failed to disclose and actively concealed the Oil Consumption Defect and the true reliability, safety, and quality of the Class Vehicles as set forth herein.

164. Accordingly, FCA engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in NYGBL § 349, including representing that Class Vehicles have characteristic, uses, benefits, and qualities that they do not have; representing that Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

165.  FCA's deceit was directed at widely purchased consumer vehicles and consequently affects the public interest. FCA's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

166.  FCA's conduct proximately caused injuries to Plaintiff McCall and New York Subclass members.

167. Plaintiff McCall and New York Subclass members have suffered ascertainable loss as a result of FCA's conduct in that Plaintiff and New York Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain, paid out-of-pocket costs relating to the Defect, and their Class Vehicles have suffered a diminution in value. These injuries are the direct, natural, and reasonably foreseeable consequence of FCA's misrepresentations and omissions.

168.  Plaintiff McCall, individually and on behalf of the New York Subclass, therefore requests that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing their unfair, unlawful, and deceptive practices. Plaintiff and New York Subclass members are entitled to recover their actual damages or $50, whichever is greater. FCA acted willfully or knowingly, so Plaintiff and New York Subclass members are entitled to recover three times their actual

damages. Plaintiff and the New York Subclass are also entitled to reasonable attorneys' fees and expenses.

### COUNT V
### Violations of the New York General Business Law
### N.Y. Gen. Bus. Law § 350 ("NYGBL § 350")
### Plaintiff McCall, Individually and on Behalf of the New York Subclass

169. Plaintiff McCall incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

170. Plaintiff McCall brings this claim individually and on behalf of the New York Subclass.

171. NYGBL § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce . . . ."

172. False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity . . . ." NYGBL § 350-a.

173. FCA caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to FCA, to be untrue and misleading to consumers, including Plaintiff McCall and New York Subclass members.

63

174. FCA violated NYGBL § 350 because the representations or omissions regarding the Oil Consumption Defect in Class Vehicles as described above were material and likely to deceive a reasonable consumer.

175. Plaintiff McCall and New York Subclass members have suffered injury, including lost money or property, as a result of FCA's false advertising and omissions. In purchasing or leasing Class Vehicles, Plaintiff McCall and Class Members relied on the misrepresentations and/or omissions of FCA with respect to the reliability, safety, and quality of the Class Vehicles. FCA's representations were untrue because the Class Vehicles are prone to excessive oil consumption and serious safety risks as described herein due to the Defect. Had Plaintiff McCall and the New York Subclass members known these true facts, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

176. Accordingly, Plaintiff McCall and New York Subclass members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

177. Plaintiff McCall, individually and on behalf of the New York Subclass, request that this Court enter such orders or judgments as may be necessary to enjoin FCA from continuing its unfair, unlawful, and deceptive practices. Plaintiff and New York Subclass members are entitled to recover their actual damages or $50, whichever is greater. FCA acted willfully or knowingly, so Plaintiff and New York Subclass members are entitled to recover three times their actual damages (of up to

$10,000 per individual). Plaintiff and New York Subclass members are also entitled to reasonable attorneys' fees.

## COUNT VI
### Violations of the Maryland Consumer Protection Act ("Maryland CPA") Md. Code Com. Law § 13-101, *et seq.* Plaintiff Anderson, Individually and on Behalf of the Maryland Subclass

178.  Plaintiff Pamela Anderson incorporates by reference each preceding and succeeding paragraph as thought fully set forth herein.

179.  Plaintiff Anderson brings this claim individually and on behalf of the members of the Maryland Subclass.

180.  Plaintiff Anderson and Maryland Subclass Members are consumers within the context of the Maryland CPA, *see* Md. Code Ann., Com. Law § 13-301(c)(1)(iii), who purchased and/or leased Class Vehicles for personal, family, or household use.

181.  FCA is a person within the context of the Maryland CPA. *See* Md. Code Ann., Com. Law § 13-101 (h).

182.  The Maryland CPA prohibits a person from engaging in any unfair, abusive, or deceptive trade practice within the State of Maryland. *See* Md. Code Ann., Com. Law § 13-303.

183.  FCA violated Md. Code Ann., Com. Law § 13-301(2)(iv) and § 13-303 by representing that Class Vehicles are of a particular standard, quality or grade, when they are not.

65

184. FCA violated Md. Code Ann., Com. Law § 13-301(2) and § 13- 303 by failing to state a material fact that deceives or tends to deceive.

185. FCA violated Md. Code Ann., Com. Law § 13-301(5)(i) and § 13- 303 by advertising Class Vehicles without intent to sell or lease as advertised.

186. FCA violated Md. Code Ann., Com. Law § 13-301(7) and § 13- 303 by selling Class Vehicles knowing that a service, replacement or repair was needed.

187. FCA violated Md. Code Ann., Com. Law § 13-301(5)(i) and § 13- 303 by deception, fraud, false pretense, false promise, misrepresentation, knowing concealment, suppression and/or omission of material facts concerning Class Vehicles with the intent to deceive Plaintiff Anderson and Maryland Subclass Members.

188. FCA committed unfair and deceptive acts in the course of trade and commerce within the context of the Maryland CPA as described in this Complaint in violation of Md. Code Ann., Com. Law § 13-301 and § 13-303.

189. FCA committed unconscionable, deceptive and unfair trade practices, including, but not limited to, deception, fraud, false pretense, false promise, misrepresentation and the knowing concealment, suppression and omission of materials facts concerning the Defect in Class Vehicles and that the vehicles are prone to excessively consuming oil causing engine stalls and damage, in connection with the sale and/or advertisement of Class Vehicles.

190. FCA fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Anderson and Maryland Subclass Members that the engines Class Vehicles would not require oil changes more frequently then noted in the maintenance schedules and that the Defect could cause engine stalling while the vehicles were in operation, increasing the risk of a serious collision.

191. FCA fraudulently, intentionally, negligently and/or recklessly misrepresented to Plaintiff Anderson and Maryland Subclass Members the characteristics of Class Vehicle engines with respect to materials, manufacture, durability, design, longevity, maintenance and operating costs.

192. FCA intended that Plaintiff Anderson and Maryland Subclass Members would, in the course of their decision to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations and material omissions concerning the quality of Class Vehicle engines with respect to materials, workmanship, design, manufacture and information in the advertising materials including brochures and the maintenance schedules of the Class Vehicles.

193. Information regarding the as described in this Complaint is material to consumers in that the Defect results in Plaintiff Anderson and Maryland Subclass Members paying for more frequent oil changes, as well as repair or replacement costs for engine damage and failure.

194. FCA violated the Maryland CPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle engines were defectively designed and/or manufactured.  Defendant also violated the Maryland CPA by failing to inform Class Vehicle owners prior to purchase and/or during the warranty period that Class Vehicle engines contained defects and would require replacement of expensive internal engine components.

195. FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff Anderson and the Maryland Subclass Members.

196.  FCA knew or should have known that its conduct violated the Maryland CPA.

197.  FCA owed Plaintiff Anderson and the Maryland Subclass Members a duty to disclose the truth about the Defect because FCA: (a) possessed exclusive knowledge of the Class Vehicles and the Defect; (b) intentionally concealed the foregoing from Plaintiff Anderson and the Maryland Subclass Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Anderson and the Maryland Subclass Members that contradicted these representations.

198.  FCA also owed a duty to disclose the Defect and its corresponding safety risk because the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects.

199.  Due to FCA's specific and superior knowledge that the engines in the Class Vehicles have the Defect, its false representations regarding that affects the qualify, safety, reliability, and performance of the Class Vehicles, and reliance by Plaintiff Anderson and the Maryland Subclass Members on these material representations, FCA had a duty to disclose to Class members that the 2.4L Tigershark engines in Class Vehicles excessively consume oil and can cause sudden stalls, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that excessively consuming oil will ultimately cause long-term damage to the engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff Anderson and the Maryland Subclass Members, FCA had the duty to disclose not just the partial truth, but the entire truth.

200.  These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff Anderson and the Maryland Subclass Members. Longevity, durability, performance, and safety are material concerns to FCA consumers. FCA represented to Plaintiff Anderson and

69

the Maryland Subclass Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact their engines excessively consume oil, necessitating more oil changes than advertised or expected, causing damage to their engines, and subjecting Plaintiff Anderson and the Maryland Subclass Members to increased risk of collisions due to stalls.

201. Plaintiff Anderson and the Maryland Subclass Members suffered injury in fact to a legally protected interest. As a result of FCA's conduct, Plaintiff Anderson and the Maryland Subclass Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

202. FCA's violations present a continuing risk to Plaintiff Anderson as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

203. As a direct and proximate result of FCA's violations of the Maryland CPA, Plaintiff Anderson and Maryland Subclass Members have suffered injury-in-fact and/or actual damage.

204. Pursuant to Md. Code Com. Law § 13-408, Plaintiff Anderson and Maryland Subclass Members seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT VII
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")
### 73 Pa. Cons. Stat. §§ 201-1 – 201-9.3
### Plaintiff McGorrey, Individually and On Behalf and the Pennsylvania Subclass

205. Plaintiff McGorrey incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

206. Plaintiff McGorrey brings this count individually and on behalf of the Pennsylvania Subclass.

207. By failing to disclose and actively concealing the defective nature of Class Vehicles, FCA engaged in deceptive business practices prohibited by the UTPCPL, including: (i) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (ii) representing that Class Vehicles are of a particular standard, quality, and grade, when they are not; (iii) advertising Class Vehicles with the intent not to sell them as advertised; and (iv) engaging in acts or practices that are otherwise unfair, misleading, false, or deceptive to the consumer.

208. FCA also violated the UTPCPL by failing to comply with the terms of its written warranty given to the buyer at, prior to, or after a contract for the purchase of goods or services is made (Pa. Cons. Stat. § 73 P.S. § 201-2 (xiv)).

209. FCA knew that its Class Vehicles were defectively designed or manufactured and were not suitable for their intended use. FCA nevertheless failed

71

to warn Plaintiff McGorrey and the Pennsylvania Subclass members about these defects despite having a duty to do so.

210. FCA owed Plaintiff McGorrey and the Pennsylvania Subclass members a duty to disclose the Oil Consumption Defect, because FCA:

> (a) Possessed exclusive knowledge of the Defect rendering Class Vehicles unfit for their intended purpose;
>
> (b) Intentionally concealed the Defect; and/or
>
> (c) Made incomplete representations about the characteristics and performance of Class Vehicles generally, while purposefully withholding material facts from Plaintiff McGorrey and the Pennsylvania Subclass members that contradicted these representations.

211. FCA's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff McGorrey and the Pennsylvania Subclass members, about the true performance and characteristics of Class Vehicles.

212. Additionally, FCA's breaches of warranty constitute unfair and deceptive acts under Pennsylvania law. FCA warranted the Class Vehicles against defects and was further obligated under its warranty to provide replacement parts or repairs necessary to remedy failures due to defects.  Instead, FCA typically at most tops off or changes the oil, which is insufficient to comply with its warranty obligations since the oil consumption caused by the Defect continues to happen.

213. FCA engaged in unfair and deceptive acts when it knowingly failed to perform its warranty obligations by failing to provide repairs or replacements necessary to resolve the Defect.

214. As a result of its violations of the UTPCPL as detailed above, FCA caused actual damage to Plaintiff McGorrey and the Pennsylvania Class members, and if not stopped, it will continue to harm McGorrey and the Pennsylvania Subclass members as FCA continues to both inadequately remedy the Defect in Class Vehicles and to sell vehicles without disclosing the Defect.

215. Plaintiff McGorrey and the Pennsylvania Subclass members sustained damages as a result of FCA's unlawful acts and are, therefore, entitled to damages and other relief as provided under the UTPCPL, including treble damages.

216. Plaintiff McGorrey and the Pennsylvania Subclass members also seek court costs and attorneys' fees as a result of FCA's violation of the UTPCPL as provided in 73 Pa. Cons. Stat. § 201-9.2.

## COUNT VIII
### Violations of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA")
### N.C. Gen. Stat. § 75-1.1, *et seq.*
### Plaintiff Caples, Individually and on Behalf of the North Carolina Subclass

217. Plaintiff Joshua Caples incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

73

218. Plaintiff Caples brings this claim individually and on behalf of the members of the North Carolina Subclass.

219. FCA engaged in "commerce" within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. Gen. Stat. § 75-1.1(b).

220. The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). FCA willfully committed unfair or deceptive acts or practices in violation of North Carolina UDTPA.

221. FCA participated in misleading, false, or deceptive acts that violated the North Carolina UDTPA as described below and alleged throughout the Complaint. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, reliability, performance and efficiency, and stood behind its vehicles after they were sold, FCA knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. FCA systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of its business.

74

222. FCA also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

223. FCA's unfair and deceptive acts or practices occurred repeatedly in FCA's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

224. FCA knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

225. FCA knew or should have known that its conduct violated the North Carolina UDTPA.

226. Plaintiff Caples and the North Carolina Subclass Members reasonably relied on FCA's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

227. Had Plaintiff Caples and the North Carolina Subclass Members known that the Class Vehicles would exhibit the Defect, they would not have purchased or leased the Class Vehicles, or would have paid less for them. Plaintiff Caples and the North Carolina Subclass Members did not receive the benefit of their bargain as a result of FCA's misconduct.

228. FCA owed Plaintiff Caples and the North Carolina Subclass Members a duty to disclose the truth about the Defect because FCA: (a) possessed exclusive knowledge of the Class Vehicles and the Defect; (b) intentionally concealed the foregoing from Plaintiff Caples and the North Carolina Subclass Members; and/or (c) made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff Caples and the North Carolina Subclass Members that contradicted these representations.

229. Due to FCA's specific and superior knowledge that the engines in the Class Vehicles have the Defect, its false representations regarding that affects the qualify, safety, reliability, and performance of the Class Vehicles, and reliance by Plaintiff Caples and the North Carolina Subclass Members on these material representations, FCA had a duty to disclose to Class members that the 2.4L Tigershark engines in Class Vehicles excessively consume oil and can cause sudden stalls, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that excessively consuming oil will ultimately cause long-term damage to the engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff Caples and the North Carolina Subclass Members, FCA had the duty to disclose not just the partial truth, but the entire truth.

76

230. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Plaintiff Caples and the North Carolina Subclass Members. Longevity, durability, performance, and safety are material concerns to FCA consumers. FCA represented to Plaintiff Caples and the North Carolina Subclass Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing engines of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact their engines excessively consume oil, necessitating more oil changes than advertised or expected, causing damage to their engines, and subjecting Plaintiff Caples and the North Carolina Subclass Members to increased risk of collisions due to stalls.

231. Plaintiff Caples and the North Carolina Subclass Members suffered injury in fact to a legally protected interest. As a result of FCA's conduct, Plaintiff Caples and the North Carolina Subclass Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

232. As a result of FCA's conduct, Plaintiff Caples and the North Carolina Subclass Members were harmed and suffered actual damages as a result of FCA's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

233. As a direct and proximate result of FCA's unfair or deceptive acts or practices, Plaintiff Caples and the North Carolina Subclass Members suffered and will continue to suffer injury in fact and/or actual damages.

234. Defendant's violations present a continuing risk to Plaintiff Caples and the North Carolina Subclass Members as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

235. Because FCA's actions and conduct were willful, Plaintiff Caples seeks an order for treble his actual damages, an order enjoining FCA's unlawful acts, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat.§ 75-16.

**COUNT IX**
**Breach of Express Warranty**
**Plaintiffs, Individually and on Behalf of the State Subclasses**

236. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

237. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

238. FCA is a "merchant" as defined under the Uniform Commercial Code (UCC).

239. The Class Vehicles are "goods" as defined under the UCC.

78

240. FCA provided a New Vehicle Limited Warranty that expressly warranted FCA would repair any defects in materials or workmanship free of charge during the applicable warranty periods.

241. FCA breached its warranty by failing to provide an adequate repair when Plaintiffs and the Class Members presented their Class Vehicles to authorized FCA dealers following manifestation of the Defect.

242. The warranty formed the basis of the bargain that was reached when Plaintiffs and Class Members purchased or leased their Class Vehicles.

243. Plaintiffs and Class Members experienced the Defect within the warranty period. Despite the existence of the express warranty and multiple repair attempts, FCA failed to inform Plaintiffs and Class Members of the Defect and failed to adequately repair the Defect.

244. As a result of FCA's breach of its express warranty, Plaintiffs and Class Members have suffered economic damages including, but not limited to, the loss of the benefit of their bargain, loss of vehicle use, diminished value, substantial loss in value and resale value, out-of-pocket expenses for maintenance and service that they otherwise would not have incurred but for the Defect.

245. FCA was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to FCA and its authorized

dealers, Class Members taking their vehicles to its dealers, a demand letter which was sent on March 13, 2020, and this lawsuit.

246. Plaintiffs and Class Members have complied with all obligations under the warranty or otherwise have been excused from performance of such obligations as a result of FCA's conduct described herein.

247. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranty in a manner that would exclude or limit coverage for the Defect, including benefit-of-the-bargain, incidental, or consequential damages, would cause the warranty to fail of its essential purpose. Plaintiffs and Class Members have presented their Class Vehicles to FCA's authorized dealers on numerous occasions and FCA has failed to remedy the Defect. As a result, Plaintiffs and Class Members are left with defective vehicles that pose a safety hazard and do not function as intended and, therefore, have been deprived of the benefit of their bargains.

248. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. FCA's warranties were adhesive and did not permit negotiations. FCA possessed superior knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles

80

for sale. FCA concealed and did not disclose this Defect, and FCA did not remedy the Defect prior to sale (or afterward).

**COUNT X**
**Breach of the Implied Warranty of Merchantability**
**Plaintiffs, Individually and on Behalf of the State Subclasses**

249. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

250. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective state subclasses.

251. FCA is a "merchant" as defined under the UCC.

252. The Class Vehicles are "goods" as defined under the UCC.

253. A warranty that the Class Vehicles were in merchantable quality and condition arises by operation of law with respect to transactions for the purchase and lease of Class Vehicles. FCA impliedly warranted that the Class Vehicles were of good and merchantable condition and quality, fit for their ordinary intended use, including with respect to safety, reliability, operability, and the absence of material defects, and that the vehicles would pass without objection in the automotive trade.

254. The Class Vehicles, when sold and leased, and at all times thereafter, were not in merchantable condition or fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles were not merchantable in that the Defect poses a significant safety hazard and can result in catastrophic engine damage. The

81

Defect therefore renders the Class Vehicles unfit to provide safe and reliable transportation.

255. FCA was provided notice of the issues complained of herein within a reasonable time by numerous complaints online, directly to FCA and its authorized dealers, class members taking their vehicle to its dealers, a demand letter sent on March 13, 2020, and this lawsuit.

256. Plaintiffs and the other Class Members have had sufficient direct dealings with either FCA or its agents, including its authorized dealerships, to establish privity of contract between FCA on the one hand and Plaintiffs and each Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Class Members are the intended third-party beneficiaries of contracts between FCA and its dealers, and specifically of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

257. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by FCA to limit its express warranty in a manner that would exclude or limit coverage for the Defect would be unconscionable. FCA's warranties were adhesive and did not permit negotiations. FCA possessed superior

and exclusive knowledge of the Defect, which is a latent defect, prior to offering Class Vehicles for sale. FCA concealed and did not disclose this Defect, and FCA did not remedy the Defect prior to sale (or afterward).

258. As a direct and proximate result of the breach of these warranties, Plaintiffs and Class Members were injured and are entitled to damages.

## COUNT XI
### Violations of the Magnuson–Moss Warranty Act ("MMWA")
### 15 U.S.C. §§ 2301–2312
### All Plaintiffs, Individually and on Behalf of the Nationwide Class

259. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

260. Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

261. Plaintiffs are "consumers" within the meaning of the MMWA, 15 U.S.C. § 2301(3).

262. FCA is a "supplier" and "warrantor" within the meaning of the MMWA, 15 U.S.C. § 2301(4)-(5).

263. The Class Vehicles are "consumer products" within the meaning of the MMWA, 15 U.S.C. § 2301(1).

264. 15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

265.  FCA's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under the MMWA, 15 U.S.C. § 2301(7).

266.  FCA breached its express and implied warranties as described in more detail above. Without limitation, the Class Vehicles contain the Defect that poses a serious safety hazard and can cause catastrophic engine damage, which renders the vehicles unfit for their intended use and unsafe.

267.  Plaintiffs and the other Class Members have had sufficient direct dealings with either FCA or its agents (e.g., dealerships) to establish privity of contract between FCA on the one hand and Plaintiffs and each Class Member on the other hand. Regardless, privity is not required here because Plaintiffs and each of the Class Members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles. The warranty agreements were designed for and intended to benefit consumer end-users only.

268.  Plaintiffs and Class Members have afforded FCA a reasonable opportunity to cure its breach of written warranties, and any further opportunity would be unnecessary and futile here as FCA has failed to remedy the Defect.

269.  At the time of sale or lease of each Class Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but it nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure under the MMWA and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

270. Plaintiffs and the Class Members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class Members have not re-accepted their Class Vehicles by retaining them.

271.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

272.  Plaintiffs individually and on behalf of the other Class Members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## COUNT XII
### Violations of Song–Beverly Consumer Warranty Act
### For Breach of Express Warranty
### Cal. Civ. Code §§ 1790–1795.8
### Plaintiff Schmid, Individually and on Behalf of the California Subclass Who Purchased or Leased Class Vehicles for Personal, Family, or Household Purposes

273. Plaintiff Schmid incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

274. Plaintiff Schmid brings this claim individually and on behalf of the California Subclass who purchased a Class Vehicle for Personal, Family or Household Purposes.

275. Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

276. The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

277. FCA is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

278. FCA made express warranties to Plaintiff and the California Subclass members within the meaning of Cal. Civ. Code §§ 1791.2 & 1793.2(d).

279. FCA breached these express warranties by selling and leasing defective Class Vehicles that required repair or replacement within the applicable warranty

86

period. Despite a reasonable number of attempted repairs, FCA has failed to adequately repair the Defect.

280. FCA has failed to promptly replace or buy back the vehicles of Plaintiff and the proposed California Subclass members as required under Cal. Civ. Code § 1793.2(d)(2).

281. As a direct and proximate result of FCA's breach of its express warranties, Plaintiff Schmid and the California Subclass members received goods in a condition that substantially impairs their value to Plaintiff and the other Subclass members. Plaintiff and the California Subclass members have been damaged as a result of, *inter alia*, overpaying for the Class Vehicles, the diminished value of the Class Vehicles, the Class Vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

282. Pursuant to Cal. Civ. Code §§ 1793.2 & 1794, Plaintiff and the California Subclass members who purchased for personal, family or household purposes are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their Class Vehicles or the overpayment or diminution in value of their Class Vehicles as well as reimbursement of out-of-pocket expenses incurred as a result of the Defect.

283. Pursuant to Cal. Civ. Code § 1794(d), (e), Plaintiff and the California Subclass members are entitled to reasonable costs and attorneys' fees.

87

## COUNT XIII
### Violations of Song–Beverly Consumer Warranty Act
### For Breach of Implied Warranty
### Cal. Civ. Code §§ 1790–1795.8
### Plaintiff Schmid, Individually and on Behalf of the California Subclass Who
### Purchased or Leased for Personal, Family or Household Purposes

284. Plaintiff Schmid incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

285. Plaintiff Schmid brings this claim individually and on behalf of the California Subclass who purchased for personal, family or household purposes.

286. Plaintiff and the California Subclass members who purchased or leased the Class Vehicles are "buyers" within the meaning of Cal. Civ. Code. § 1791(b).

287. The class vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

288. FCA is a "manufacturer" of the Class Vehicles within the meaning of Cal. Civ. Code § 1791(j).

289. FCA impliedly warranted to Plaintiff Schmid and the California Subclass members that Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

290. Section 1791.1(a) provides that: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods must meet each of the following:

(1) Pass without objection in the trade under the contract description.

88

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

291. The Defect in the Class Vehicles is present in them when sold and substantially certain to manifest. The Class Vehicles would not pass without objection in the automotive trade because the Defect causes all or substantially all of the vehicles to experience excessive oil consumption and to fail to operate as intended. The Defect thus affects the central functionality of the vehicle, poses a serious safety risk to drivers and passengers, and causes increased maintenance costs.

292. Because the Defect creates an unreasonable risk to driver and passenger safety, and because the Class Vehicles are unfit for their ordinary purpose due to the Defect, the Class Vehicles are not fit for the ordinary purposes for which such vehicles are used.

293. Class Vehicles are not adequately labeled because the labeling fails to disclose the Oil Consumption Defect and does not advise the California Subclass members of the Oil Consumption Defect.

294. Any attempt by FCA to disclaim its implied warranty obligations under the Song-Berverly Act is ineffective due to its failure to adhere to Sections 1792.3 and 1792.4. Those sections of the Civil Code provide that, in order to validly disclaim the implied warranty of merchantability, a manufacturer must "in simple

and concise language" state each of the following: "(1) The goods are being sold on an 'as is' or 'with all faults' basis. (2) The entire risk as to the quality and performance of the goods is with the buyer. (3) Should the goods prove defective following their purchase, the buyer and not the manufacturer, distributor, or retailer assumes the entire cost of all necessary servicing or repair." Cal. Civ. Code § 1792.4(a). FCA's attempted implied warranty disclaimer does not conform to these requirements.

295. The Oil Consumption Defect deprived Plaintiff and the California Subclass members of the benefit of their bargain and have resulted in Class Vehicles being worth less than what Plaintiff and other California Subclass members paid.

296. As a direct and proximate result of FCA's breach of its implied warranties, Plaintiff and the California Subclass members received goods that contain a defect that substantially impairs their value. Plaintiff and the California Subclass members have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, out-of-pocket costs incurred, and actual and potential increased maintenance and repair costs.

297. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff and the California Subclass members are entitled to damages and other legal and equitable relief, including, *inter alia*, benefit-of-the-bargain damages, overpayment or diminution in value of their Class Vehicles, and reasonable attorneys' fees and costs.

<u>**COUNT XIV**</u>
**Fraudulent Concealment**
**All Plaintiffs, Individually and on Behalf of the State Subclasses**

298. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

299. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

300. FCA made material omissions concerning a presently existing or past fact in violation of common law. FCA did not fully and truthfully disclose to its customers the true nature of the Oil Consumption Defect. A reasonable consumer would not have expected the Defect in a new vehicle and especially not a Defect that poses a serious safety risk and can cause catastrophic engine failure.

301. FCA made these omissions with knowledge of their falsity and with the intent that Plaintiffs and Class Members rely upon them.

302. The facts concealed, suppressed, and not disclosed by FCA to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Class Vehicles or pay a lesser price.

303. FCA had a duty to disclose the true quality and reliability of the Class Vehicles because the knowledge of the Defect and its details were known and/or accessible only to FCA; FCA had superior knowledge and access to the relevant

facts; and FCA knew the facts were not known to, or reasonably discoverable by, Plaintiffs and Class Members. FCA also had a duty to disclose because it made many affirmative representations about the qualities and reliability of its vehicles, including references as to safety and general operability, as set forth above, which were misleading, deceptive, and incomplete without the disclosure of the additional facts set forth above regarding the actual reliability of their vehicles.

304. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less in doing so. Thus, Plaintiffs and the other Class Members were fraudulently induced to lease or purchase Class Vehicles, containing the Defect.

305. Plaintiffs and Class Members reasonably relied on FCA's material omissions and suffered damages as a result. FCA's conduct was willful, wanton, oppressive, reprehensible, and malicious. Consequently, Plaintiffs and Class Members are entitled to an award of punitive damages.

## COUNT XV
### Unjust Enrichment
### In the Alternative to All Other Claims
### All Plaintiffs, Individually and On Behalf the State Subclasses

306. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

307. Plaintiffs bring this claim, under the laws of their respective home states, individually and on behalf of their respective State Subclasses.

308.  This claim is pleaded in the alternative to the other claims set forth herein.

309.  As the intended and expected result of its conscious wrongdoing, FCA has profited and benefited from the purchase and lease of Class Vehicles that contain the Defect.

310.  FCA has voluntarily accepted and retained these profits and benefits, knowing that, as a result of its misconduct alleged herein, Plaintiffs and the Class were not receiving Class Vehicles of the quality, nature, fitness, reliability, safety, or value that FCA had represented and that a reasonable consumer would expect. Plaintiffs and the Class Members expected that when they purchased or leased a Class Vehicle, it would not contain a Defect that makes the vehicle unreliable and poses a serious safety risk.

311.  FCA has been unjustly enriched by its deceptive, wrongful, and unscrupulous conduct and by its withholding of benefits and unearned monies from Plaintiffs and the Class rightfully belonging to them.

312.  Equity and good conscience militate against permitting FCA to retain these profits and benefits from its wrongful conduct. They should accordingly be disgorged or placed in a constructive trust so that Plaintiffs and Class Members can obtain restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other similarly situated, hereby request that this Court enter an Order against FCA providing for the following:

A. Certification of the proposed Class and/or Subclasses, appointment of Plaintiffs and their counsel to represent the Class, and provision of notice to the Class;

B. An order permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C. Injunctive relief in the form of a recall or free replacement/repair program;

D. Equitable relief, including in the form of buyback of the Class Vehicles;

E. Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F. An Order requiring FCA to pay pre- and post-judgment interest on any amounts awarded, as provided by law;

G. An award of reasonable attorneys' fees and costs as permitted by law; and

H. Such other or further relief as may be appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury for all claims so triable.

Dated: May 4, 2020                         Respectfully submitted,

                                    By:    */s/ Kenneth R. Chadwell*_____
                                           **Mantese Honigman, PC**
                                           Douglas L. Toering (P34329)
                                           Kenneth R. Chadwell (P39121)
                                           1361 E. Big Beaver Rd.
                                           Troy, MI 48083
                                           Phone:  248-457-9200
                                           dtoering@manteselaw.com
                                           kchadwell@manteselaw.com

                                           **CHIMICLES SCHWARTZ KRINER
                                            & DONALDSON SMITH LLP**
                                           Timothy N. Mathews
                                           Alex M. Kashurba
                                           361 W. Lancaster Avenue
                                           Haverford, Pennsylvania 19041
                                           Tel: (610) 642-8500
                                           tnm@chimicles.com
                                           amk@chimicles.com

                                           **CAPSTONE LAW APC**
                                           Steven R. Weinmann
                                           Tarek H. Zohdy
                                           Cody R. Padgett
                                           Trisha K. Monesi
                                           1875 Century Park East, Suite 1000
                                           Los Angeles, CA 90067
                                           Tel: (310) 556-4811

                                           **BERGER MONTAGUE PC**
                                           Russell D. Paul
                                           Jeffrey L. Osterwise
                                           Amey J. Park
                                           Abigail J. Gertner
                                           1818 Market Street
                                           Suite 3600
                                           Philadelphia, PA 19103
                                           Tel: (215) 875-3000

Fax: (215) 875-4604
rpaul@bm.net
josterwise@bm.net
apark@bm.net
agertner@bm.net

*Counsel for Plaintiffs and the Proposed Putative Class Members*

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN

MICHELLE SCHMID, LUIS
MUNOZ, SHERRI MCCALL,
PAMELA ANDERSON, DANIEL
MCGORREY, and JOSHUA
CAPLES on behalf of themselves and
all others similarly situated,

      Plaintiffs,

      v.

FCA US LLC,

      Defendant.

No. _____

**JURY TRIAL DEMANDED**

**CLASS ACTION**

### CLRA VENUE DECLARATION OF PLAINTIFF MICHELLE SCHMID PURSUANT TO CALIFORNIA CIVIL CODE SECTION 1780(d)

I, Michelle Schmid, have knowledge of the facts stated herein and, if called upon to do so, could competently testify thereto.

2.      I am a Plaintiff in the above-captioned action.

3.      I submit this declaration in support of the Class Action Complaint, which is based in part on violations of the Consumers Legal Remedies Act, California Civil Code section 1750 et seq.

4.      The Class Action Complaint has been filed in the proper place for trial of this action.

5.      I declare under penalty of perjury under the laws of California and the United States that the foregoing affidavit is true and correct to the best of my

knowledge, and was executed by me in the city of _Oro Grande_,

California, on May 4, 2020.


_____
MICHELLE SCHMID